(54 South. 714.)

No. 18,115.

SPIZALE v. LOUISIANA RY. & NAVIGATION CO.

(Feb. 13, 1911. Rehearing Denied March 27, 1911.)

*(Syllabus by Editorial Staff.)*

1. RAILROADS (§ 370*)—OPERATION OF TRAINS —NEGLIGENCE.

Where it was not customary for a railroad company to ring the bell or sound the whistle while switching in a yard, except when passing street crossings, the omission to do so on a particular occasion was not actionable negligence toward one familiar with the movements of the trains in the yard.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1203–1265; Dec. Dig. § 370.*]

2. RAILROADS (§ 398*)—OPERATION OF TRAINS —LOOKOUT.

In an action against a railroad company for injuries to a trespasser on the track, struck by an engine, evidence *held* not to show a failure of the engineer to keep a reasonable lookout.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 398.*]

3. RAILROADS (§ 359*)—INJURIES TO TRESPASSERS ON TRACK—LIABILITY.

A railroad company, occupying for its tracks and terminals a strip of ground over which no street crosses for 2,711 feet, does not owe any duty to a trespasser to cover a drain on the strip.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1238; Dec. Dig. § 359.*]

4. RAILROADS (§ 359*)—TRESPASSERS—LIABILITY.

A railroad company owes to a trespasser only the general duty to keep a reasonable lookout in moving its trains, and not to run over him after having seen him.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1238; Dec. Dig. § 359.*]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Mary B. Spizale, on her own behalf and in behalf of her infant son, against the Louisiana Railway & Navigation Company. From a judgment for plaintiff, defendant appeals. Reversed, and action dismissed.

Foster, Milling, Brian & Saal, for appellant. E. S. Whittaker, for appellee.

PROVOSTY, J. The plaintiff's little son, 11 years old, was run over by a switch engine of the defendant company, and both his legs cut off; and plaintiff, in her child's behalf and also in her own, sues in damages.

After the defendant's road, on its way into the city and towards the river, has crossed Napoleon avenue, it enters upon a strip of ground belonging to the city, but of which by grant from the city the defendant company has the perpetual use for its tracks and terminals. This strip of ground is along the downtown embankment of the New Basin Canal. Along the base of the embankment there used to be a wide drainage canal. The defendant company has filled in this old canal for a considerable distance, beginning, we may say, at Carrollton avenue and going towards the river, and built a long narrow

warehouse upon the site. Beyond this warehouse, in the direction of the river, the old canal still exists and is usually full of water. The tracks are alongside of this warehouse and old canal. There are three of them—one main track and two side tracks. They are 13 feet apart from center to center. On the other side of them, 12 feet from them, is the fence of the White City amusement park and baseball grounds and a continuation of this fence. From Carrollton avenue to Hagan avenue, a distance of 2,711 feet, no street crosses this strip of ground, and only one street opens upon it and only on one side. The tracks are constructed as in the open country; that is to say, the earth is raised to the top of the cross-ties along the center of the track between the rails, and sloped towards the sides, so that the ends of the cross-ties are not filled between. As an effect of this construction, there is a depression between the tracks, and drains have had to be provided across the tracks for letting out the drainage water.

A freight train of 20 cars and a locomotive came across Carrollton avenue going towards the river, on the main track; the locomotive pushing the cars with its head end towards them. When the forward end of the train reached the first switch, which is about 1,500 feet from Carrollton avenue, six of the cars were kicked down the main track. The train then stopped and remained stationary about one minute. The forward end, from which the six cars had been detached, had gone one car length beyond the switch. As the next two end cars had to be switched to the side track, the train backed far enough to clear the point of the switch, or about two car lengths, and then moved forward again far enough to put the two cars upon the side track, and again stopped.

At the time that the train began to move forward this last time to put the two cars upon the side track, the fireman, who was sweeping the coal dust on the floor of the engine, heard a noise, which he calls a scream, but which, on cross-examination, he described as follows:

"Q. Was it a noise like a calf or a pig? A. It was a noise like—(witness grunts) I can't tell you exactly. Q. Was it loud or soft? A. It was not very loud. Q. Could a little boy have made a noise like that while you were backing a few minutes before, and you not hear it on account of the noise of the engine? A. He might have made the noise and I didn't hear him."

The fireman got off the engine and looked for the source of the noise, and saw the little boy under the locomotive. There was a small drainage ditch there across the track, and he was lying in it with both legs across the rail.

His story is that, on his way back from carrying a message for his mother to his brother, who was working in the White City amusement park, he had passed through a hole under the fence of the White City and had walked alongside of the track a distance of about 60 feet towards the locomotive; and that, when about 35 or 40 feet of it, seeing that it remained stationary, he had decided to cross the track; and that just as he stepped upon the track the locomotive started off and jerked the cars; and that the noise made thereby scared him, and, being afraid to run across the track, he went to turn around, and, as he did so, he stepped into the ditch which was behind him and fell.

The negligence charged against the defendant company is that the bell was not rung before the locomotive moved, nor the whistle sounded; that a proper lookout was not kept; and that this little ditch, or drain, was left uncovered.

The evidence shows that it was not customary to ring the bell or sound the whistle upon this yard while switching, except in passing the street crossings; the not doing so on this particular occasion was therefore not negligence. Moreover, the evidence shows

further that the boy lived about a block from this yard, and was familiar with the movements of the trains upon it, and that he knew that this very train was engaged in doing switching work and constantly moving back and forth, and that it was therefore liable to move at any moment, and make the very noise which it made.

The engineer testifies that he was keeping a proper lookout; and he is not contradicted, except that it is shown that, while the train was stationary, he was so absorbed in conversation with the track foreman, who, in violation of the rules of the company, was riding upon the engine, that the signal for backing had to be given him twice. That circumstance, by the way, accounts for the train having remained stationary on that occasion longer than was usual or necessary. The engineer was not alone in failing to see the boy while the latter was, as he says, walking alongside of the track, or standing upon it; the fireman, the yardmaster, and the brakeman also did not see him. The yardmaster and the brakeman, it may be well to mention, were on the uptown or New Basin side of the track, and therefore on the side opposite to that from which the boy approached the track. The train was therefore between them, which may account for their not seeing him.

A track foreman who, with 15 other colored men, was repairing the track between Carrollton avenue and the place where the engine was stopped, and who had had to interrupt his work and remove his tools from the track in order to let the train pass, and who, after the train had passed, stood upon the track looking at the engine, about a hundred or more feet from it, to see whether it was coming back, in order that, in case it was not, he might resume his work, says that, after he had given his men the order to get the tools out of the way to let the train pass, he walked ahead to remove his "stop board" from the track, and at that moment saw the boy on the top of the White City fence, and did not at any time see him on the track.

Conceding, however, for the argument, that this small drain in its uncovered state was so evidently a source of danger that the leaving of it in that condition amounted to negligence on the part of the defendant company, and conceding further that the statement of the boy as to the manner in which he fell into this drain is true, the defendant company owes him nothing, since it owed him no legal duty with reference to the drains upon its yard; and since, he being a trespasser upon its yard, it owed him no other duty than the general duty to keep a reasonable lookout in moving its locomotive, and not to run upon him after having seen him. Elliott on Railroads (2d Ed.) § 1258, vol. 3, page 612.

From the evidence as a whole we are inclined to believe that the boy fell into the ditch, not in the way he says, but while trying to steal a ride upon the footboard of the engine. This would account fully for his position, with both legs upon the track and unable to get out in time not to be run over. Whereas, his being frightened by a noise which he was hearing every day, since he lived within half a block from this yard and had but just heard, with which he was perfectly familiar; his trying to turn back, instead of going ahead and crossing the track; his inability to get out of the ditch or gutter in time to avoid a slow coming engine 35 to 40 feet away; and his not screaming so as to be heard by so many persons near by— all seem improbable. And, finally, if the witnesses are not mistaken in their estimate of how far the forward end of the train went beyond the switch, the train was not far enough in the direction of the river for the engine to have been clear of this drain, but the engine was over this drain while the

train was stationary, and not 35 or 40 feet from it, as the boy says.

Judgment set aside, and suit dismissed, at plaintiff's cost.