Defendant's fast southbound passenger train, at the hour of 12:55 A.M., October 10, 1941, near the Village of Cypress, in Natchitoches Parish, ran into and killed five mares and one filly, the property of plaintiff. This suit was instituted to recover the value of the stock, the sum of Five Hundred Twenty ($520.00) Dollars. It is charged that the animals were killed because of the negligence of defendant's train operatives, in that the train, under the circumstances, was going at an excessive speed; a proper lookout was not maintained, and no warning whatever was given the animals of the train's approach; and, finally, that the right-of-way at and about the locus of the accident was not fenced.
Defendant denies that the stock were killed through its negligence or that of its train crew, and specially denies that any legal duty devolved upon it to fence the right-of-way. Further pleading, defendant avers that the accident was unavoidable in that the presence of the animals on the trestle was not known and could not have been known to its operatives until it was too late to stop the train before running into them.
From a judgment for plaintiff as prayed for, defendant appealed.
The stock when killed were huddled together on a trestle in defendant's track. They had escaped from plaintiff's pasture adjoining the track at or near the site of the accident. *Page 169 
Beginning at a distance of 525 feet from the north end of the trestle the track describes a right curve that ends a short distance from the north end of the trestle. The engineer testified that the train was about 600 feet from the horses when they were first seen by him. They were not seen earlier because the beam of the headlights, while the locomotive was in the curve, did not focus down the track, but to the east side thereof.
The train was traveling in open country at a speed of about 60 miles per hour or 88 feet per second. It required from 2,000 feet to 2,500 feet to stop it when going at that speed. As soon as the stock were seen, the engineer applied the brakes and opened the cylinder cock. Steam from both ends of the cock goes forward. It requires six seconds for the brakes to become effective and as the train was moving at 88 feet per second nearly all of the distance between it and the horses was covered by the time the brakes responded.
The lower court found and held that defendant successfully exonerated itself from the specific charges of negligence contained in plaintiff's petition but went further and held defendant liable for the value of the stock by attributing to it negligence not specifically set up by plaintiff; that is, the original construction of the trestle as described hereinafter.
The record abundantly sustains the court's conclusions as regards the acts of negligence specifically set up in the petition.
[1, 2] The fact that the right-of-way was not fenced has no legal significance beyond that which involves the burden of proof. Acts 70 and 110 of 1886. If the right-of-way of a railway company is adequately fenced and efficient cattle guards are maintained, the owner of stock killed or injured by a train carries the burden of proving negligence on the part of the train crew as the cause of the injury or killing; but, if the right-of-way is not fenced and adequate cattle guards not maintained, it devolves upon the railway company, in such circumstances, to prove its operatives free from negligence as the cause of the killing or injury if it would escape liability therefor. The above-cited acts of the Legislature establish rules of evidence which have been uniformly recognized and applied by the courts of this state. The latest expressions of this court on the subject are found in the cases of Edwards v. Thompson, La. App., 2 So.2d 493, and Smith v. Thompson, La. App., 185 So. 71.
[3, 4] The train was not being operated at an excessive rate of speed. It is well established by legion of decisions that passenger trains may be operated in the open country at such speed as is consistent with their own safety and that of their passengers.
For lack of time the whistle was not blown nor was the bell sounded, but had either or both been done it is highly improbable that the horses would have attained a place of safety by coming toward the train.
[5] In view of the arrangement of the track immediately above the trestle the trainmen saw the horses as quickly as was possible. It was then too late to stop the train before running into them. No negligence is chargeable to defendant on this score unless upon the ground that the curve should not have been there or that the speed of the train should have been reduced to the extent that it could be stopped in the distance between the south end of the curve and where the horses were. No such contentions are advanced and surely none could be successfully advanced in support of either proposition. Of necessity trains must run on schedules and if it were required that they be operated at such speed as to be stopped within so short a distance or be slowed down before entering curves, their efficiency as a means of transportation and their service to the public would be greatly impaired.
The trestle in question is 202 feet long and spans a bayou. It connects earthen dumps at either end. The height of the dumps are not shown. It is shown that the northern 85 feet of the trestle as well as the southern 75 feet are decked with 3" x 6" timbers upon which rest the ties. Gravel has been poured over the ties and into the spaces between them. This makes it possible for stock to walk upon these two parts of the trestle with the same safety as could be done on the track above and below. However, between these two sections, a distance of 45 feet, the trestle was not decked and the 8" spaces between the ties were open. Stock could not safely walk over this part of the trestle.
The horses when first seen by the engineer were huddled together near the south end of the 85-foot section of the trestle. *Page 170 
It is obvious that the horses, with the train north of them and the open trestle south of them, were doomed unless they jumped into the bayou below. The lower court held that the horses were trapped and predicated its finding of liability upon this conclusion.
Defendant's counsel submits that the judgment is erroneous for the following reasons, to-wit:
"(A) It is based upon a ground of negligence not covered by Acts 70 and 110 of 1886.
"(B) It is based upon erroneous assumption.
"(C) It imposes upon the owner of premises an obligation which has been denied, both by the Courts of Louisiana and those of other states."
[6] In support of proposition (A) defendant argues that when the court found and held the horses were not killed from the negligent operation of the train, judgment should have gone for it. In other words, its position, as we understand it, is that in any case unless it is shown that the stock was killed or injured from the negligent operation of the train, Act 70 of 1886 does not apply. We think this construction of the act too strict. It is conceivable that cases could arise wherein liability would attach although the train operatives be free of fault. The language of the act admits of this interpretation. It says that in suits for the value of stock killed or injured by railroads, to recover, plaintiff need only prove the killing or injury "unless it be shown by the defendant company that the killing or injury was not the result of fault or carelessness on their part or the negligence or indifferent running or management of the locomotive or train." It is clear on analysis that liability may accrue against a railway company: (1) When the killing or injury of stock results from its fault or carelessness and (2) From the negligent or indifferent running or management of the locomotive or train by its employees. A train may be operated in a highly careful and efficient manner but due to defects in track construction or otherwise it could be derailed and stock entirely off of the right-of-way be killed by portions of cars or coaches. In such circumstances liability would attach although the train operatives be entirely free of negligence.
A decision on the issues raised and discussed under assignment of error (B) would not be determinative of the question of liability vel non of defendant. We pretermit passing on such issues. This attitude becomes the more justified because of the belief that defendant's position under assignment of error (C) is supported by sound reasons and authority. We shall predicate our judgment thereon.
[7] Preliminary to a discussion of this assignment of error, defendant's energetic counsel asks and correctly answers the following question, viz: "What duty was owing by the Railroad Company to plaintiff as owner of the straying cattle on its right of way? As we see it the only duty was not to injure them by the negligent operation of the train, or by any other willful or wanton act of negligence, and not to lure them onto the premises."
[8] Obviously, there was no defect in the construction of the trestle. It was in no sense of the word a lure to persons or animals; nor was it an attraction to them. It was built on defendant's private property and was as fully protected by law against trespassing as any other part of its trackage. We do not think the construction of the trestle constituted a trap such as would render defendant liable for the value of the stock.
[9] In approaching the question presently discussed, it is well to first determine, as near as may be, the status of the stock while on defendant's track and trestle. Ordinarily we do not refer to stock going upon a railroad track as a trespass, but the rules of law applicable to trespassing by people on railroad property also, to some extent, apply to domestic animals. Irresponsible creatures such as cattle and horses, when trespassing upon private property, have been likened to young children as regards the duty due them by the owner or possessor. Tomlinson et ux. v. Vicksburg, S. P. Ry. Co.,143 La. 641, 79 So. 174, 175.
In this case, in denying recovery, the court said: "Those cases (turntable cases) were recognized to be exceptions to the general rule that the property owner owes no duty to trespassers, except to avoid injuring them willfully, and that he is not obliged to guard his premises against intrusion, even by irresponsible creatures. If the departure from that general rule goes very far, it might be quite difficult to say whether any case where a child has been accidentally injured while trespassing on a stranger's premises is within the exception *Page 171 
or the rule. The doctrine of responsibility for having on one's premises an inviting or attractive danger to children must be — and we think it has been — confined to cases where the dangerous agency is so obviously tempting to children that the owner is guilty of negligence for failing to observe and guard against the temptation and danger."
In Rosse v. St. Paul D. Ry. Co., 68 Minn. 216, 71 N.W. 20, the court held that a young child has the same duty owing to it as domestic animals.
This same principle was recognized and upheld in Nickolson v. Northern Pac. Ry. Co., 80 Minn. 508, 83 N.W. 454, and in Marengo v. Great Northern Ry. Co., 84 Minn. 397, 87 N.W. 1117, 87 Am.St.Rep. 369, wherein the court said that where a railroad company was required to construct and maintain a fence against stock same inured to the benefit of children of tender years who by negligence in that respect are injured.
Therefore, since the law places children and irresponsible creatures on the same footing as respects trespassing on private property, it is apropos to ascertain the character of duty due by others to young children trespassers. The rule is clearly expressed in 39 American Jurisprudence § 118, verbo "Negligence", to-wit: "Under ordinary conditions, trespassing children occupy the same position as trespassing adults. The accepted view is that the tender age of a child, rendering it incapable of looking out for its own safety, does not raise a duty where none otherwise exists; to warrant a recovery for an injury to a child trespasser, it must be shown, the same as in the case of an injury to an adult trespasser, that the injury was wilfully or wantonly inflicted or was caused by the negligence of the owner or occupant after the presence of the trespasser upon the premises was known, or reasonably should have been known, to him."
The principle embodied in this quotation finds support in many cases of this state, including the following: O'Connor v. Illinois Cent. R. Co., 44 La. Ann. 339, 10 So. 678; Fredericks v. Illinois Cent. R. Co., 46 La. Ann. 1180, 15 So. 413; Spizale v. Louisiana Ry. Nav. Co., 128 La. 187, 54 So. 714; Hendricks et ux. v. Kansas City Southern R. Co., 142 La. 499, 77 So. 130; Fincher v. Chicago, R. I. P. R. Co. et al., 143 La. 164, 78 So. 433, 438; Tomlinson et ux. v. Vicksburg, S. P. R. Co., supra; Peters v. Pearce et al., 146 La. 902, 84 So. 198; Buchanan v. Chicago, R. I. P. Railway Company Burtoh, 9 La. App. 424, 119 So. 703.
Defendant owed no duty to the owner of the horses other than to not wantonly or willfully kill them after discovering their presence upon its track. If children had been congregated on the trestle, instead of horses, and had been killed, surely defendant would not have been responsible in damages therefor.
For the reasons herein given, the judgment appealed from is annulled, reversed and set aside and plaintiff's suit dismissed at his cost.