LAND, J.
Plaintiff sued the Louisiana Railway & Navigation Company, the Yazoo & Mississippi Valley Railroad Company, and the New Orleans, Texas & Mexico Railroad Company to recover of them in solido the *361 sum of $30,000 damages resulting from the death of her husband, N. T. Courtney, who was killed on the night of August 10¡ 1910, by a switch engine of the Yazoo & Mississippi Valley Railroad Company. The suit as against the other two railroads was dismissed on exception of misjoinder, but the same exception was overruled as to the Yazoo & Mississippi Valley Railroad Company. The same defendant filed an exception of no cause of action, which was also overruled. The case' was tried before a jury, and the result was a verdict and judgment against the defendant for $17,500 and costs. Defendant appealed.
It appears from plaintiff’s petition that the decedent, in an intoxicated condition, boarded the train of the Louisiana Railway & Navigation Company at Baton Rouge station, intending to get off at the North Baton Rouge station; that he failed to get off at the latter station and was put off by the conductor several hundred yards beyond his point of destination; that the decedent was at the time in a drunken and helpless condition, and a few minutes later while lying on the track of a branch road of the Louisiana Railway & Navigation Company was run over and killed by an incline engine belonging to the Yazoo & Mississippi Valley Railroad Company, which at the time was hauling “a cut of cars” belonging to and operated by the New Orleans, Texas & Mexico Railroad Company.
The petition alleged that the Yazoo & Mississippi Valley Railroad Company was negligent for the following leasons:
“That Courtney was seen, or should have been seen, by the engineer of the engine in time to avert the tragedy ; that, although Courtney was seen by the engineer before the train struck him, no bell was rung, no whistle blown, no brakes applied, or other effort made to prevent the engine passing over bis body; that the train was carelessly and recklessly handled and improperly and inefficiently equipped, the headlight particularly being unsuited to the use to which the locomotive was applied.”
The engineer of the locomotive which ran over the body of Courtney died before the trial of the case. Willie Williams, the fireman, was called as a witness on behalf of the plaintiff, and the salient points of his testimony may be stated as follows: On the night of the accident the switch engine on which' Williams was employed was engaged in transferring cars of the New Orleans, Texas & Mexico Railroad Company, commonly called the “Frisco,” from the railroad transfer boat at Baton Rouge. Certain switch tracks of the Louisiana Railway & Navigation Company were used for this purpose. When the accident occurred, the engine was pulling 12 or 13 freight ears. Five employSs were on the train, to wit, Dawson, engineer, Williams, fireman, Wonder, engine foreman, Waites, and another brakeman. When the engine struck Courtney, he was lying on the track with his body on the inside of the rails and his legs projecting beyond the rail on the west side of the track. The train was running five or six miles an hour. The engineer and fireman were in the cab when Courtney was hit.
Williams further testified as follows:
“Q. Did you see Courtney before the engine struck him?
“A. I saw something white laying out there.* I couldn’t tell if it was a man or not. I just got through putting in a fire and it blinded me. After you put in a fire you are always blind for a while on account of the glare of the fire.
“Q. But when you did look you saw an object on the tracks?
“A. Yes, sir; but I couldn’t tell what it was.
“Q. Well, how far was your engine from this object when you first saw it?
“A. I guess it was a little further than the door over there, just a little further than that.
“Q. When I asked you about this fact this morning, didn’t you point it out as being very much further than that to me?
“A. I don’t know how far it was; perhaps a little over 100 feet.
,“Q. Over 100 feet? '
' “A. Yes, sir.
“Q. Now, when you saw this object lying there, or after you saw it, were there any steps taken to check or stop the train?
“A. Well, when we hit something we made an effort to stop. The engineer said, ‘We hit something;’ and when he stopped the train we got *363 down, and looked and saw what it was. We took a torch back there and saw him. * * *
“Q. And it was then you saw something on the track but couldn’t tell what it was?
“A. No, sir; I did’nt know what it was. * * *
“Q. You are positive that you saw Courtney for the first time just about the time you got off the curve?
“A. Well, I saw that white object, but I couldn’t tell whether it was a man or a piece of papei’.
“Q. But it did turn out to be Mr. Courtney?
“A. Yes, sir.”
On cross-examination: •
“Q. Were you ringing the bell?
“A. Yes, sir; I was.
“Q. If you had seen a man laying there on the track, wouldn’t you have called Mr. Dawson’s attention to it?
“A. If I had known it was a man, certainly I would; yes, sir.
“Q. You didn’t know whether it was a man you saw there or not?
“A. No, sir; I couldn’t tell.
“Q. You say it looked like a piece of paper?
“A. Yes, sir; that’s the way it looked to me; I had just put a fire in the engine; I am always half blind for a few minutes after I do that. * * *
“Q. Isn’t it a fact that you have seen paper on the track before?
“A. Yes, sir; I have seen paper on that main line before, and on the wye too. ■
“Q. You would not have stopped for a piece of paper, would you? You were not in the habit of doing that?
“A. No, sir; we couldn’t afford to stop for a piece of paper.
“Q. Wasn’t that train handled with the usual care ?
“A. Yes, sir; about like we always did.
“Q. This was what time of night?
“A. About 10:35 or somewhere in there.
“Q. Do you remember what sort of night it was.
“A. I don’t think the moon was out; I think it was a dark night.”
The position of Courtney at the moment of the accident was inferred from the nature of his wounds. One of his legs was practically severed near the groin, and the other just above the knee. Courtney had on a pair of dark trousers, a white shirt with black stripes, and a felt hat.
The most that can be deduced from the testimony of Williams is that the engineer might have seen something resembling a white piece of paper on the track. The sight of the object did not create the slightest suspicion in the mind of Williams that it was the body of a human being or an obstacle of any importance. Wonder, engine' foreman, and Waites, brakeman, testified that they knew, from an actual experiment made on the night of the accident, that the engineer could not have seen the body of Courtney on the track. They gave as reasons the curve of the wye, darkness of the night, and weeds on or near the track.
The petition alleged that the headlight was defective. The evidence shows that an oil lamp was used, and the chimney was slightly smoked; but that oil lamps are always used on switching engines, and that on incline engines, going up and down steep grades, the chimneys cannot be prevented from becoming more or less smoked.
Dawson was an experienced and cautious engineer. He was at his post when his switch engine ran over the body of Courtney, and as soon as he felt the jar made a quick stop. He said to the brakeman:
“John, didn’t we run over something?”
Dawson stated to Wonder, the foreman, that he could not see Courtney on the track, and at Dawson’s suggestion Wonder and Waites made the experiment above mentioned.
The undertaker and his assistant differ from the trainmen as to the place of the accident and locate it several.hundred feet further down the. track. These two witnesses testified from their recollection of the place where they found the remains of the body. Wonder said that Courtney’s body was run over at a point 120 feet from the opening of the wye by actual measurement and notation made by him at the time. Waites, the brakeman, said that he threw the switch at the opening of the wye, and the body was found three or four car lengths from the switch. Williams said that the engine had just run out at the end *365 of the switch when he saw something on the track, which afterwards proved to be the body of Courtney. As stated before, Williams estimated the distance as about 100 feet. Of course the testimony of these three witnesses cannot, on the evidence before us, be reconciled with that of the undertaker and his assistant. It was a dark night, and the trainmen were more likely to have remembered the precise place of the accident. It may be noted that Williams at the date of the trial was not in the service of the Ya-zoo & Mississippi Valley Railroad Company but had other employment. He was called as a witness by the plaintiff.
[1] Courtney, according to the allegations of the petition, was guilty of gross contributory negligence. He on a dark night, while drunk and staggering among railroad tracks, laid himself down or fell on the passing trek of the Louisiana Railway & Navigation Company, over which the incline engine of the Yazoo & Mississippi Valley Railroad Company was busily operating in hauling cars from the transfer boat. Plaintiff hopes to recover on the last clear chance doctrine. The burden of proof was on the plaintiff to prove, with legal certainty, that Dawson, the engineer, or the fireman saw, or should have seen, the body of her husband on the track in time to have avoided the accident. There is no evidence that Dawson saw any object on the track that should have induced him, as a prudent engineer, to have made an emergency stop. Prom the testimony of Williams, an inference may be deduced that Dawson might have seen something like a piece of white paper on the track, but it may be deduced from the same testimony that the sight of such an object would have conveyed no notice to Dawson that a human being was lying on the track. The place of the accident was within the railroad yards, where only a few people passed at night. The general doctrine as to injuries to strangers in railroad yards has been enunciated- as. follows:
“If one who is not an employé, without the knowledge or consent of the company, goes into its yards which are interlaced with tracks, upon which engines and cars are being switched and changed, he must use care commensurate with the perú in which he has placed himself, and the company owes him no duty except not to injure him willfully or by negligence after its employés see his danger and inability to escape in time to prevent such injury by the exercise of due care.” Elliott on Railroads (2d Ed.) vol. 3, § 1258.
This section was cited in Spizale v. Louisiana Railway & Navigation Co., 128 La.- 192, 54 South. 714, where this court said that a railroad owed to a trespasser on its yards “no other duty than the general duty to keep a reasonable lookout in moving its locomotive and not to run upon him after seeing him.” It stands to reason that, quoad trespassers, less care should be required in railroad yards than on regular tracks, where the safety of passengers, trainmen, and the public is involved in the ordinary operation of .trains.
In the operation of regular trains, the duty of keeping a lookout for objects and obstructions on the track is 'imposed in the, interest of employés, passengers,! and licensees, and “inures also to the benefit of trespassers.” McOlanahan’s Case, 111 La. 786, 35 South. 902.
In that case a drunken man was lying on the main track of the Vicksburg Shreveport & Pacific Railway near the village of Bossier City, opposite the city of Shreveport, and in broad daylight was run over and killed by a ■freight train approaching on a straight track. The body was seen by the engineer of the train in time to have avoided the accident, but his excuse was that he mistook the obstacle for a cross-tie or piece of timber. In the McGuire Case, 46 La. Ann. 1543, 16 South. 457, a drunken man on a well-lighted track in the city of Monroe was run over and killed by a freight train. In both eases *367 the court found that the engineers could have avoided the accident if they had made proper use of their senses of sight.
In Gilliam v. Texas & P. R. R. Co., 114 La. 272, 38 South. 166, the plaintiff’s husband was asleep, in a state of intoxication, between the rails of defendant’s track on a dark night and was killed by one of its trains moving backward at the time. The verdict and judgment below in favor of the plaintiff was reversed by this court. The plaintiff contended that the defendant was negligent in not having a bright light on the end car to enable the brakeman to discern objects on the track in time to avert injury. This court said that, assuming that the defendant was guilty of some' negligence, it was beyond dispute that plaintiff’s husband was guilty of gross contributory negligence, and that the railroad employés had no reason to anticipate that a trespasser would be found on a dark night lying drunk and helpless between the tracks.
We further said that the situation was exceptional, and that the plaintiff could not reasonably require greater precautions for the protection of her husband. In the same case the court said:
“There was no question in the McClanahan Case as to the duty of the defendant company to have furnished light sufficient to see objects upon the tracks ahead. The accident occurred in the daytime, and nature herself had furnished the light. The negligence of the company consisted in the fact that its employés did not make use of their senses to see, although there was plenty of light to do so.
In White v. Illinois Central R. Co., 114 La. 825, 38 South. 574, the court held that trespassers walking in the middle of a railroad track at night cannot be permitted to disregard all prudential measures and exact them in an unusual degree from railroad corporations, and inter alia said:
“In such a case there should be no nice balancing of the scales to determine as to the side upon which the duty of care and prudence should be cast.”
In the ease at bar the defendants’ employés operated the switch engine in the usual manner and kept the usual lookout. They had no reason to anticipate that a drunken man might be lying between the rails of the track. According to plaintiff’s own witness, nothing was visible ahead of the engine except an object which looked like a piece of white paper. The failure of the trainmen to recognize this object as the body of a man is a ground of negligence imputed to the defendant corporation. It does not appear that under the circumstances ordinary human vision could have discerned the body of Courtney on the track. The contention that the body might have been perceived, if the headlight had not been defective, is disposed of by the ruling in the Gilliam Case, and also by evidence that the smoking of the chimney of the lamp was a usual and ordinary circumstance in the operation of the incline engine.
The doctrine of the last clear chance necessarily implies that the defendant, under the circumstances of the case, saw the danger or was grossly negligent in not seeing it, in time to avoid the accident. The evidence in this case fails to establish either hypothesis with any degree of certainty.
It is therefore ordered that the verdict and judgment below be set aside and reversed, and it is now ordered that plaintiff’s suit be dismissed, with costs in both courts.