135 So.2d 521 (1961)
Mary Terrell OLIVER et al., Plaintiffs-Appellants,
v.
ILLINOIS CENTRAL RAILROAD COMPANY et al., Defendants-Appellees.
No. 9595.
Court of Appeal of Louisiana, Second Circuit.
November 22, 1961.
Rehearing Denied December 27, 1961.
Certiorari Denied February 6, 1962.
*522 Nelson & Gray, Shreveport, for appellants.
Freyer & Freyer, Mayer & Smith, Shreveport, for appellees.
Before HARDY, GLADNEY and AYRES, JJ.
GLADNEY, Judge.
This is a suit by Mary Terrell Oliver, individually and as tutrix for the minors, Billy Ray Oliver, Patricia Ann Oliver and Ella Mary Oliver, children of her deceased husband, Arthur Oliver, to recover damages resulting from the death of her husband in a train-truck collision about 12:30 P.M. on June 30, 1959, at the intersection of the Illinois Central Railroad's main line and Bodcau Road, in Bossier Parish. Made defendants, and charged with liability by reason of negligence, are Illinois Central Railroad Company, Kesk, Inc., the latter's insurer, U. S. Fidelity & Guaranty Company, and Sylvester Gould, locomotive engineer of the Illinois Central train.
The case went to trial on its merits and the trial court rendered judgment holding *523 there was an absence of proof of negligence on the part of Kesk, Inc. and Sylvester Gould; that the railroad was guilty of negligence, and the deceased Oliver was guilty of contributory negligence. Plaintiff's demands were therefore, rejected, and she has appealed.
The trial judge, in a most thorough statement of his reasons for judgment has accurately stated the circumstances material to the issues, and we adopt his findings as set forth below:
"At the point where the accident happened and where Oliver's death occurred, the Illinois Central Railroad runs east and west. The right of way of the railroad is 150 feet, 75 feet on each side from the center of the main track. Parallel to the railroad and on the south side of the railroad, is situated Barksdale Air Force Base, with a wire fence running east and west, said fence presumably being on the south boundary of the railroad right of way. Bodcau Road runs north and south at this point. It is a gravel road and, as the Bodcau Road crosses the railroad track, the road terminates at a gate which is one of the entrances to Barksdale Air Force Base. At the time of this accident, Kesk, Inc. was constructing for Capehart Housing Projects a large number of housing units inside of Barksdale Air Force Base and the people employed on this job and those who were furnishing materials and supplies on this construction job used the Bodcau Road and this particular entrance gate to Barksdale Air Force Base to gain entrance to the base.
"There was a spur track on the north side of the main line of the Illinois Central Railroad several hundred feet long. This spur track, and, of course, the main line of the railroad, crossed Bodcau Road at this point. Some 50, 60 or 70 feet from the point where the Bodcau Road crossed the railroad and on the west side of Bodcau Road, some 60 or 70 feet, Braswell Industries had a portable concrete mixing plant which they referred to as a `batch' plant. These people, Braswell Industries, were furnishing cement and concrete in its wet stage, called `batch', for the construction of the housing units inside of Barksdale Base. The allegations and evidence showed that there was a temporary driveway constituting a half circle leading off from Bodcau Road on the west, going by the Braswell Industries concrete mixing machinery and again coming back into the Bodcau Road about 37 feet from the spur track. The empty mixing trucks would return from inside of Barksdale Base, cross the railroad and go to the north entrance of this driveway by Braswell's plant, load up with wet concrete, complete making their half circle and again enter Bodcau Road just north of the railroad crossing. The testimony showed that the center of the south exit of this driveway where it entered Bodcau Road was 37 feet from the railroad tracks. The mixing trucks, after being loaded, as they would come out of this driveway, would be facing east and southeast until they reached Bodcau Road. Then, they would turn south, proceed some 30 to 35 feet, cross the spur track and then the main line and go through the entrance gate to Barksdale Field approximately 70 feet south of the main line of the railroad. There were several mixing trucks used on this job, one of the trucks being driven by Oliver. Oliver had worked on this same job, doing this same work, half of a day on June 25. On June 30, the day of the accident, he reported for duty about 7:30 A. M. and had made some five or six round trips delivering batch into Barksdale Field. On his last trip, as he came out of Braswell plant site and started across the railroad, his truck was struck by a westbound Illinois Central passenger train operated by Sylvester Gould and he was instantly killed. This happened at 12:30 p. m., June 30, 1959. Incidentally, the entire train was derailed as a result of the impact.
"It is alleged, and evidence shows, that there were four gondola cars spotted on the side track east of Bodcau Road with *524 the end of the westernmost gondola just a very few feet east of Bodcau Road. In other words, traffic on Bodcau Road as it crossed the spur track would pass within a few feet of the western end of the westernmost gondola. In addition to the testimony, it is stipulated that, at the time of the accident, there were four of these gondola cars parked in the above stated position. All four of these gondola cars, when spotted by the Illinois Central Railroad, had contained large spools of cable. Each gondola would hold four of these large spools. The cable on these spools was also being delivered at the time inside of Barksdale Field, but not for the Capehart Housing Project. The cable on these spools has nothing to do with this lawsuit but the spools themselves, sticking up in the air, and the four gondola cars parked on the side track, have a great deal to do with the lawsuit. As the spools were delivered into Barksdale Field and the cable removed therefrom, the empty spools were again placed on the gondolas, presumably for a return to their owners. The testimony showed that the top of these spools was 11 feet above the ground. The testimony is indefinite and inconclusive as to which of the gondolas were loaded with these spools of cable at the very moment of the accident."

* * * * * *
"It was stipulated by counsel that if the employee of Illinois Central Railroad who furnished information to the Interstate Commerce Commission were present and testified in this trial, that he would testify that four gondolas were on the side track at the time of the accident and that only the first and third gondolas were loaded with spools and that the load height of these gondolas was 11 feet 3 inches above the rails.
"All of this thoroughly convinces the Court that, at the time of the accident at 12:30 p. m., June 30, Car Number 377243, which was the westernmost gondola of the four spotted gondolas, had on it at least three and possibly four spools of cable. The west end of this gondola was adjacent to Bodcau Road. Any motorist traveling Bodcau Road, headed south, would certainly have had his vision obstructed, of a train approaching from the east."

* * * * * *
"The testimony showed that the seat of the driver of the particular truck driven by Oliver was about seven feet from the ground. The driver's eyes would be approximately nine feet from the ground. The engine approaching from the east was 15 feet high. Whether or not a truck to unload the spools of cable was parked by the side of the gondola is uncertain and inconclusive.
"The train was approaching from the east, going west. If a driver of a truck coming out of the Braswell plant driveway faced east and southeast until he entered Bodcau Road proper and then turned south, the question is whether or not the driver of the truck, as he entered Bodcau Road, could see over the gondolas and over the spools of cable on the gondolas, and also whether or not the driver of the truck could see past the easternmost gondola, down the railroad track, and see an approaching train. As above stated, and as disclosed by the testimony, the center of the south exit of the Braswell driveway as it entered Bodcau Road was 37 feet from the railroad track. It was nine feet from the north rail of the main line track to the south rail of the spur track. Two of the gondola cars themselves were 54 feet long and 10 feet 8 inches wide, and 54 feet 8 inches long and 10 feet 4 inches wide, respectively. There was considerable testimony also to the effect that there were bushes and grass growing along the right of way of the spur track on the north side in an eastward direction from Bodcau Road, which it is alleged also obstructed the view of Oliver to a trail approaching from the east.
"Plaintiffs allege that it was carelessness on the part of the Illinois Central Railroad to spot these gondola cars, loaded with spools of cable, so near the place where Bodcau Road crossed the railroad and to *525 permit bushes and grass to grow along the right of way to the east in such manner as to obstruct the view of Oliver as he crossed, or attempted to cross, the railroad and that this carelessness and negligence on the part of the railroad created a virtual death trap, causing the death of Oliver. It is also alleged that Sylvester Gould, the engineer on the train involved in the accident, did not blow his whistle and did not ring the bell and traveled at an excessive rate of speed at a dangerous crossing and that the railroad company and the driver of the engine, Sylvester Gould, having intentionally and deliberately created a hazardous condition, failed to take the necessary precautions to overcome a dangerous situation which they, themselves, had created."
The trial court held the Illinois Central Railroad was guilty of negligence in permitting the placement of the gondola cars in such proximity to the Bodcau Road as to obstruct the view of crossing motorists without taking some additional precautions. It also determined that the negligence of Oliver was a proximate cause of his death as he could have and should have seen the train approaching if he had looked, and could have heard the train's whistle had he listened. The court said it was Oliver's duty to stop, look and listen before he attempted to make the crossing. The court found there was no statutory or contractual relationship which required the defendant, Kesk, Inc., to station a guard at the crossing, and consequently, it was not responsible in damages irrespective of negligence on the part of the guard. It was further held that the defendant, Gould, exercised due care at his post as engineer and negligence on his part was not proven.
The appellants assign error to the lower court's decree in holding: Oliver was guilty of contributory negligence; that there was an absence of proof as to the legal responsibility of Kesk, Inc. to warn traffic of the approach of the train; that negligence of Kesk's guard, Vann, is not imputable to the railroad; and finally, in the alternative, in failing to hold the railroad had the last clear chance to avoid the accident. On these points we again refer to the opinion of the District Judge as follows:
"Mr. Sylvester Gould, the engineer of the train that struck and killed Oliver, testified that this was the sixth run he had made from Vicksburg to Shreveport, that he was familiar with this crossing, knew of the construction work that was going on at Barksdale Field and that he could see the crossing about two miles east of the crossing. Mr. Gould testified that he saw Oliver's truck as it left Braswell plant and came down southeast and entered Bodcau Road and turned south towards the railroad crossing. Mr. Gould stated he started blowing the train whistle with the regular crossing signal. He said he started blowing the whistle considerably east of the whistle post. The evidence shows that the whistle post is between 1,600 and 1,700 feet east of the crossing. Mr. Gould also testified that the fireman started ringing the automatic bell at the same time he started blowing the whistle and that, as he approached the crossing near the east end of the spotted gondola cars that he observed the front end of Oliver's truck come upon the main line tracks and that he immediately began the alarm signal which is a succession of short blasts, and that both the train whistle, first with the regular crossing signal and later with the alarm blast and, the ringing of the bell, continued from the time he started east of the whistle post until the engine struck Oliver's truck. Mr. Gould further testified that he applied the emergency brakes when he got near the east end of the parked gondola cars, some 250 feet east of the crossing, and observed Oliver's truck coming up on the main line tracks. Mr. Gould said he could and did observe Oliver from the time Oliver left the Braswell driveway and entered Bodcau Road and turned south, except for a brief time that Oliver was behind the gondolas, until he again saw Oliver's truck as it protruded past the spotted gondolas and went up on the main line track; that it was too late then for Gould to stop the *526 train or to avoid the accident. Notwithstanding, he continued to blow the distress whistle and put on the emergency brake. Gould testified that, although he saw Oliver approaching the crossing, he assumed that he would stop and not proceed across the crossing. Mr. Gould further testified that, at the time of the accident, there was not a truck with a crane unloading these spools of cable. Henry Cyrus, fireman, corroborates the testimony of Mr. Gould, the engineer, except Cyrus did not see Oliver's truck until it came on the main line of the railroad track.
"Mr. Charles L. Skinner, one of plaintiffs' witnesses, testified that, on June 30, he was returning in his car from lunch to his work on Barksdale Base, with Mr. Troy Meredith in the back seat and Mr. F. A. Dean in the front seat of the car with him. Mr. Skinner testified that, as he was coming toward the base down Bodcau Road, as he got about 45 yards north of the railroad crossing, the accident occurred. Mr. Dean testified that he saw Oliver come out of Braswell's driveway and turn right toward the crossing. To quote, `I heard a train whistle and I told Frank that we were going to have to wait on that passenger train that day. That was customary. We saw it almost daily and knew that it was about due, and he told me, "We ought to get around that truck as we won't have to eat his dirt" and I told him "We can't go around him now until we get inside the base," and I heard this train whistle and it became obvious to me that the truck was not going to stop before going over the crossing so I told Frank, "I believe that truck is going to be struck." I don't believe that is the exact words I used. I believe I told him, "That truck is fixing to get it", and at that time I was watching for the enginethis house that is marked on this chart was blocking my view of the east of the cars parked on the siding and I was watching to the right side of that house for me to see that engine in order that I might estimate his speed.' Question, `How fast was the train going?' Answer, "I believe he was doing about 60.' Question, `Mr. Skinner, prior to the train striking the truck, did the truck stop?" Answer, `Yes'. Question, `Where did the truck stop?' Answer, `His front wheels were between the rails on the main line south track.'
"Mr. Skinner further testified that there were four gondola cars spotted on the siding and that as Oliver came out of the Braswell driveway facing east that he could have seen past the end of the last spotted gondola to the east and could have seen the approaching train, except for the time that Oliver was behind the westernmost gondola when his view of the approaching train would have been cut offthat Oliver would have had to get his truck into the siding before the gondola cars would have blocked the main line. In other words, before he got on that crossing, he could have seen. Plaintiffs' attorney pleaded surprise at this witness' testimony in that it differed from statements made in his written statement and that, inasmuch as he was a hostile witness, plaintiffs' counsel asked permission to cross examine the witness. The witness, on cross examination in substance, testified that in his written statement he meant that Oliver could not see the approaching train when Oliver was behind the end of the parked gondolas and that, of course, he could not see through the gondolas. On cross examination, Mr. Skinner stated he did not know whether Oliver could see the approaching train or not as he came out of the Braswell driveway. The Court attaches the most importance to that part of Skinner's statement that Oliver did not stop as he came out of the Braswell driveway and turned south and started across the track, until he stopped on the main line. He testified he had never driven out of Braswell's driveway himself and crossed the railroad; therefore, he did not know whether Oliver could have seen the train or not. His testimony whether Oliver could have seen the train or not would be a mere speculation, one way or another, but Skinner's testimony that Oliver did not stop is very definite and very important.
*527 "In addition to the testimony of Mr. Gould, the engineer, and the fireman, Cyrus, that Gould started blowing the whistle and Cyrus started ringing the bell somewhere around the mile post, 1,600 or 1,700 feet east of the crossing, changing from the regular crossing blast of the whistle to emergency blasts, several other witnesses testified that they heard the whistle blowing. There is no doubt in the Court's mind that the whistle was blowing continuously from the whistle post to the point of impact. From the testimony of a number of witnesses, the Court is convinced that Oliver did not stop his truck as he came out of the Braswell driveway and turned south on Bodcau Road until he stopped the truck with the front wheels between the main line rails and a second or two later was struck and killed. Mr. Gould testified his train was going 59 miles an hour. This would be about 88 feet per second. Gould testified he saw the front end of Oliver's truck protruding over the main line when the engine was about even with the end of the easternmost gondola. This would be about 250 feet east of the crossing. It would be about three seconds from the time Gould saw Oliver's truck on the track until he hit it, certainly not time enough for Gould to have done anything to avoid the accident.
"There is testimony as to whether or not Bodcau Road was a public road. The road terminated at the railroad right of way. Ordinarily, only those people who lived in the immediate vicinity and those people who had business inside Barksdale Field had any need to use this road. Inside Barksdale Field by an ordinance and contract by the Police Jury of Bossier Parish, all roads inside of the base formerly owned by the Parish had been closed. Barksdale Field itself began on the south side of the railroad right of way. At this particular time, however, and perhaps some several weeks before, the traffic over Bodcau Road at this point was comparatively heavy due to the construction work going on inside of the base. The road was used extensively at this time. Ordinarily, it was not. There was no stop sign placed by the railroad at this crossing in compliance with Louisiana law. That fact is admitted. The law says that at all public roads crossing a railroad, the railroad shall place a stop sign not less than 50 feet nor more than 75 feet from the tracks. Had there been such a sign, it would have been north of where Oliver came out of Braswell driveway into Bodcau Road because this point was 37 feet from the tracks, so had there been a sign, it could not have benefitted Oliver because it would have been behind him as he entered Bodcau Road and turned south to cross the tracks."

* * * * * *
"It is alleged that Kesk, Inc., who were the contractors for the construction of the housing units inside of Barksdale Field, had employed Paul D. Vann as a guard at the gate entering the air base to direct traffic in and out of the said gate and that his duties also were to flag traffic crossing the railroad at this point and to warn those using the crossing of the approach of trains, and that said guard failed to perform his duty and did not warn Oliver and that this negligence on the part of Kesk, Inc., through their employee, Paul D. Vann, constituted negligence, causing the death of Oliver and that the Illinois Central Railroad knew of the employment of this guard and were familiar with his duties and that his negligence is also attributable to the Illinois Central Railroad.
"On March 9, 1959, Kesk, Inc. entered into a contract with the United States Corps of Engineers for the construction of the Capehart Housing Project. This contract is identified as Kesk-5. This is the only contract in the record concerning Kesk. The contract provides that Kesk may use the Bodcau gate entrance to the air base but that Kesk must furnish security guards at the gate at their own expense, and the contract further provides for regulating traffic in and out of Barksdale Field, to keep the gate securely locked when not being used and that they will *528 keep up the roads used by them inside of Barksdale Field. There is nothing in the contract about flagging traffic crossing the railroad crossing. There was a conference held between Kesk, the United States Corps of Engineers and officials of Barksdale Air Force Base, a memorandum of which meeting was filed as Kesk-4. Mr. L. E. Endsley, manager for Kesk, testified that he made these arrangements for a guard on duty at this gate entrance to Barksdale Field with the Provost Marshal and that Kesk was to employ soldiers on the base when they were off duty at the expense of Kesk."
The responsibility of Kesk, Inc. rests upon whether or not there is contractual responsibility between Kesk, Inc. and Oliver, and secondly, as to whether or not Kesk, Inc. incurred a legal obligation from the fact that Oliver placed reliance upon the security guards supplied by Kesk for his own safety. The applicable contractual provisions relied upon by plaintiffs read:
"Access to the project site. The eligible builder will be allowed to use Bodcau Perimiter Gate No. 1 for access to the project site provided (1) that the contractor provide security guards at the gate to maintain reservation security at all times during regular working hours at the project site and at such other times as necessary to permit delivery of material and equipment to the site; (2) that the gate be locked in a secure manner at all times when security guards are not on duty at the gate; (3) that the eligible builder shall bear all expenses connected with gate security including wages for security guards; and (4) that the road from Bodcau gate to the project site be maintained in good condition for vehicular traffic during the entire construction period, and be left in a good condition at least equal to that at the beginning of construction as determined by the contracting officer when construction is completed. Any other road within the reservation boundaries which the eligible builder is given permission to use in writing shall be maintained in good condition for vehicular traffic at all times during the construction period and shall be left in a satisfactory condition at completion of construction as determined by the contracting officer." (Emphasis supplied.)
The security guards were furnished as a result of the conference between the Provost Marshal of Barksdale Air Force Base, and the officials of Kesk, Inc. A memorandum of the conference was prepared which indicated the contractor was permitted to use the Bodcau gate entrance to the base, but that:
"The provost marshal will allow the contractor to use the Bodcau gate; however, he would have to furnish his own guards and keep the gate locked at all times that it was not in use or guarded."
L. E. Endsley, accordingly, made arrangements for the employment of off-duty air police and gave instructions that all vehicular traffic must be stopped at a safe distance from the railroad crossing when trains are approaching the railroad crossing intersection. In explaining his reasons for this additional precaution beyond the air force gate, he testified:
"Actually, the instruction as to what they were to do was to come from the Provost Marshal's office. The only thing I did add was to watch the railroad traffic, the reason for that being there is an embankment that you cannot see over as you come out of the gate. At the time, I was not concerned with coming the other way, because you could see. Of course, at that time there was only room for about one car to be spotted there. After that time they extended the siding, or a least the loading area beside of the siding. The siding was already there; they *529 did not extend it, but they did extend the road." (Emphasis supplied.)
It is plain, we think, that Endsley was only interested in protecting traffic on the south side of the railroad, for he thought no particular danger faced a motorist who was approaching the crossing from the north side. Furthermore, regardless of any contractual arrangement which Kesk may have had with the officials at the Air Force Base, we fail to see how it could benefit Oliver or the other employees of Braswell Industries. Counsel for appellant argues, however, that Kesk assumed the duty of flagging and should be held responsible. In authorities cited in appellants' brief, the rule of assumed duty is thus stated:
"It is the law that if one who is under no duty to another to protect him in person or property voluntarily assumes such a duty, he must perform it in a reasonably careful manner, and while he is not bound to continue that duty permanently he must see that reasonable notice is given if he intends no longer to perform it." Id., Taylor v. Roosevelt Irrigation District, 72 Ariz. 160, 232 P.2d 107, 110.
The principle of law set forth finds precedent in A. L. I. Restatement of the Law of Torts, § 325. It requires proof that the gratuitous services rendered were consistently relied upon. It does not appear that Oliver depended upon the security guards for warning of the approach of a train.
The testimony of Paul Vann indicates quite clearly that Oliver who had crossed the railroad tracks on numerous occasions during the day of the accident and the day before, did not completely rely upon the guards which were stationed for the purpose of directing traffic. Had he followed this procedure we think Oliver would not have ignored the presence of Vann, which he apparently did. Other testimony in the record indicates that the security guards hired by Kesk, Inc., wandered about and paid very little attention to their responsibilities. They walked off the station when they pleased, and Vann admitted in the instant case even after hearing the whistle of the approaching train, he never looked and did not see it until the impact. Our conclusion, therefore, is that legal responsibility of Kesk, Inc. has not been established in the instant case.
Appellants further charge the ruling of the lower court that the negligence of Paul Vann is imputed to the Illinois Central Railroad Company. This premise is untenable and unnecessary to decide but we can conceive of no reason why it was incumbent upon the railroad company to object to or agree to the presence of such employees for security guards, and there is no evidence that it did either.
We find that Oliver should have heard the repeated signals given by the engineer of the train had he listened, for the repeated whistling was heard by many other witnesses in his vicinity. It was a warm day and the window of his truck was down. As presumed, there was some noise by his truck or for other causes. The preponderance of the evidence also, we think, clearly discloses that Oliver was in a position to see the train and stop his truck on the north side of the tracks. As his truck left the loading station it faced due east and upon inspection of a photograph identified IC-4, it is obvious that he should have been able to see the train approaching had he looked. This is true even if the train was in the "dip". Some witnesses testified as to the obstruction of vision, by reason of a hill, buildings, weeds, etc., in looking toward the east as Oliver should have been doing. After examining the evidence we have concluded that these witnesses, Jimmy Allen Rachal and Buick Holmes, were in error. Contrary testimony is furnished by Foulk, Charles L. Skinner, Frank A. Dean, Sgt. Duncan Wymer and N. J. Hovious. The testimony of the last named witness is substantiated *530 by the photograph above mentioned.
We are of the opinion the evidence clearly preponderates to the effect that Oliver could have seen the train had he looked, and it was his duty to do so. LSA-R.S. 32:243, subd. A provides:
"It shall be the duty of every person operating, or permitting to be operated, a vehicle, when approaching a grade crossing of a public highway with any railroad or tramway, to bring such vehicle to a complete stop in such a manner and for such time as to enable the operator to observe the approach of trains or cars, by looking up and down the track in both directions and by listening therefor, before proceeding. In the event it is impossible so to do, then such persons shall proceed only with the greatest caution and at their peril."
It is a recognized legal principle that the duty rests upon the driver of a motor vehicle to look at the time and place when he can see. Young v. Louisiana Western R. Co., 153 La. 129, 95 So. 511 (1923). The lower court expressed the following view as to the negligence of Oliver, with which we are in accord:
"The Court is also convinced that Oliver had used this crossing and crossed it some ten or twelve times on the 25th and 30th days of June, one half day each, and was familiar with the crossing; and that Oliver could have seen the approaching train past the eastern end of the spotted gondolas had he looked, and that he could have heard the whistle blowing and the bell ringing, had he listened, and had he observed the laws of the State of Louisiana to stop before entering the crossing, the accident would have been avoided and he would not have lost his life, and that, therein, his contributory negligence bars plaintiff's recovery."
Our jurisprudence holds that the more obstructed the view of a motorist who is approaching a railroad crossing, the more care he must observe. Calvert Fire Insurance Company v. Texas and Pacific Ry. Co., 55 So.2d 693 (La.App. 1st Cir. 1951). In Hanks et al. v. Arkansas Louisiana Missouri Ry. Co. et al., 62 So.2d 139 (La.App. 2d Cir. 1952), it was held the driver of a motor vehicle in negotiating a railroad crossing is burdened with the responsibility of seeing and hearing that which could and should have been seen and heard and he is required to use such care as is commensurate with existing danger.
We also agree with the trial court that the Illinois Central Railroad Company was guilty of negligence in spotting the gondola cars in the manner it did without taking additional safety measures. The effect of the placement of these cars was to create a dangerous condition. McFarland et al. v. Illinois Central Railroad Company, 122 So.2d 845 (La.App. 1st Cir. 1960); 241 La. 15, 127 So.2d 183.
Finally, appellants rest their case upon the last clear chance doctrine and argue that the railroad is negligent as Oliver was unaware of his peril until too late to extricate himself from such a position, and that the engineer actually discovered the peril when he first saw the truck, at which time the train was one-half mile or more of the crossing. We find no merit in this contention. The burden of proof is on the plaintiff to show that the train crew saw or should have seen the truck and realized that it was in imminent peril in time to avoid the accident. Courtney v. Louisiana Railway & Navigation Company, 133 La. 360, 63 So. 48 (1913) and Anderson et al. v. Southern Bell Tel. and Tel. Company, 74 So.2d 761 (La.App.1954; cer. denied). When the engineer Gould first observed Oliver, Oliver was twenty-five feet from the crossing with ample time and space within which to bring his truck to a stop. Also he was in a *531 position to observe the train had he looked. Gould testified that he anticipated the truck would be brought to a stop and not attempt to cross. As soon as he realized the driver of the truck was in danger he applied the emergency brakes. It is a well known fact that an automobile can be stopped more quickly than a train. It was pointed out in Bordenave v. Texas & New Orleans Ry. Co., 46 So.2d 525, 529 (La.App.Orl. Cir. 1960):
"The jurisprudence in Louisiana is to the effect that those in charge of a railroad train may presume that an individual or vehicle approaching a crossing will stop in time to avert an accident and that, consequently, there is no negligence in their failure to anticipate that this will not be done. This rule recognizes the practical fact that many pedestrians and motorists approach the nearest point at which they can stop with safety before halting to permit a train to pass; it also incorporates the practical rule that it would not be possible to operate trains on time or even on a reasonable schedule if they were required to stop or to prepare to stop each time an individual or vehicle was seen to approach."

* * * * * *
"It thus appears that our jurisprudence is well settled that where the crewmen in charge of a train see an automobile approaching the tracks on which the train is operating, they are not negligent in assuming that it will stop unless such assumption is unreasonable under the circumstances. It necessarily follows that if they persist in this belief and this belief continues to be reasonable until it is no longer in their power to avoid the accident, there is no negligence on their part and no liability attaches to the railroad company."
Clearly, the last clear chance doctrine is not applicable.
For the foregoing reasons we have failed to find error in the judgment from which appealed and accordingly, it is affirmed at appellants' cost.