## ILLINOIS CENTRAL RAILROAD COMPANY

v.

## BRASWELL INDUSTRIES, INC., et al.

### Sylvester GOULD

v.

### H. J. SYMONS POOL et al.

### Civ. A. Nos. 7782, 7900.

United States District Court
W. D. Louisiana,
Shreveport Division.

March 13, 1964.

A. B. Freyer, and Sam A. Freyer, Freyer & Freyer, Shreveport, La., James J. Thornton, Jr., Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, La., Ado

C. Skeels, Morgan, Baker, Skeels, Middleton & Coleman, Shreveport, La., for plaintiffs.

Harry R. Nelson, Nelson & Gray, Shreveport, La., G. M. Bodenheimer, Jr., Bodenheimer, Looney & Jones, Shreveport, La., Charles L. Mayer, Mayer & Smith, Shreveport, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

These consolidated cases involve a unique approach to a common type of railroad crossing accident—a sort of "man bites dog" situation.

Illinois Central Railroad Company sues to recover damages resulting to its equipment from the derailment of its locomotive and passenger cars in a collision with a concrete-mixer truck; and the locomotive engineer seeks recovery for personal injuries received in the derailment.

Trial of these cases was stayed pending final outcome of a suit filed in the 26th District Court, Bossier Parish, Louisiana, against the Railroad for allegedly causing the wrongful death of Arthur Oliver, driver of the truck. Judgment was rendered there dismissing the action because of Oliver's contributory negligence. The Court of Appeal for the Second Circuit of Louisiana affirmed, Oliver v. Illinois Central Railroad Company, 135 So.2d 521 (1961); and certiorari was denied by the Louisiana Supreme Court on February 6, 1962.

The accident occurred between Bossier City and Haughton, Louisiana, where an extension of the Bodcau Road proceeds north and south across the Illinois Central Railroad tracks, which extend east and west. The road is gravel surfaced and is maintained by Bossier Parish up to the railroad right-of-way which covers an area about seventy-five (75) feet on either side of the main tracks. Immediately south of the right-of-way is Barksdale Air Force Base, which maintains its own roads. Naturally, the right-of-way is maintained by the railroad. Thus the road over the tracks was not a public road and the statutes pertaining to public roads are not applicable.

A spur track immediately north of the main track also crossed Bodcau Road and extended a short distance to the west where it joined the main track. However, the major portion of the spur track was to the east of the road. At the time of the accident it was on this eastern portion of the spur track that railroad cars were spotted for unloading materials. The inner rail of the spur track was approximately 9½ feet, and the outer rail approximately 14½ feet, north of the main track.

About 120 feet northwest of the crossing was an overhead cement, sand and gravel loader, referred to as a "batch" plant, which Braswell Industries, Inc., used to load its concrete-mixer trucks. About 160 feet due north of the crossing was an entrance to a semicircular driveway which led under the loader for the batch plant and then came back out onto Bodcau Road about 25 or 30 feet north of the spur track. The concrete mix from this plant was being carried by Braswell mixer-trucks over the railroad crossing and into Barksdale Air Force Base to a Capehart Housing Project being constructed for the government by Kesk, Inc.

Spotted on the spur track to the east of the crossing were four gondola cars. Although the evidence is somewhat conflicting, photographs taken shortly after the accident and testimony of the witnesses establish that the four gondola cars were end to end; that the first gondola car was only about four feet from the crossing; and that it was loaded with at least three large spools which extended 11 feet 3 inches above the rail of the spur track. The second and fourth cars were empty, but the third car was filled to capacity with spools extending to the same height. The photographs and testimony clearly establish that at a point 15 or 20 feet north of the spur track the view down the main track to the east was entirely blocked.

Shortly before 12:30 p. m., June 30, 1959, Oliver, an employee of Braswell and driver of one of its trucks, received a load of sand, gravel, cement and water at

the batch plant. He had carried several loads over the crossing and into the Base that morning, and also had worked there about one-half day on June 25. After loading, he proceeded down the driveway in a southeasterly direction. The truck mixed the cement while in route from the batch plant to the jobsite and, with the mixer on, it was almost impossible to hear any outside sounds. Thus it is likely that Oliver never heard the whistle or bell of the locomotive until just before he had driven onto the main track.

As he left the plant and approached the track, Oliver proceeded at almost walking speed, generally estimated at about 5 m. p. h. or less. He seemed totally oblivious to the train, although the locomotive engineer, Sylvester Gould, testified that he was able to see the truck even before it entered Bodcau Road from the batch plant. Under the circumstances, Gould reasonably thought that the truck would stop, and thus did not slow the locomotive below its speed of approximately 59 m. p. h. The truck passed from view of the engineer for just a moment, and then appeared from behind the gondola cars. Gould sounded the emergency whistle and applied the brakes, but it was too late. The evidence shows that the truck actually came to a stop on the main track for a second or two before the train hit it.

■ Oliver was killed instantly, his truck demolished, and the train derailed and badly damaged. The state court concluded that Oliver should have heard and seen the train in time to avoid the accident. Having sat in a similar truck during the trial, with the mixer in operation, we cannot agree that he should have heard the train in time. However, since he was familiar with the crossing and knew that his view would be blocked when he neared it, we agree that he was negligent in failing to observe the train before he reached the point at which the gondola cars blocked his view entirely.

For a substantial distance east of the crossing a westbound train proceeds up a slight grade, which gives it the appearance of coming up from a dip. This dip, plus the presence of weeds along the right-of-way, does prevent an approaching train from being seen at the distance which one might expect. Although a witness testified that he saw another train approaching this crossing when it was slightly over 2000 feet away, the court participated in a demonstration re-enacting the accident and did not see the locomotive until it was about 900 to 1000 feet from the crossing. This was from a position in the cab of a cement-mixer truck, exactly like the one involved in the accident, located near the exit from the batch plant driveway. Moreover, we were aware that the train was coming and were intentionally looking for it. We could not hear the whistle until the front of the engine was about two car lengths from the crossing. The failure of the driver to see or hear the train is understandable, but not legally excusable. Brinson v. Illinois Central Railroad Company, 241 F.2d 494 (5 Cir. 1957); Oliver v. Illinois Central Railroad Company, supra.

Oliver was not the only one, however, whose negligence led to this accident. The evidence clearly establishes that there was no point within the last 15 or 20 feet north of the main track at which Oliver could have stopped and seen the train. The northernmost rail of the spur track was 14½ feet north of the main track, and, as clearly portrayed in the photograph identified as exhibit P–12, about 6 feet before reaching the spur track the view to the east is completely blocked.

The evidence established that the truck could not stop after clearing the gondola cars without placing its front bumper over the main track. Substantiating this is the fact that the concrete-mixer truck measured 6 feet 11 inches from its front bumper to the seat in the cab, and that the locomotive protruded an undetermined distance past the rail, as did the gondola car.

The truck Oliver was driving was equipped with air brakes operated by a brake pedal similar to those in automobiles. The evidence does not show the approximate distance it would take for

such a truck to stop when moving at a speed of 5 m. p. h. or less. The standard stopping chart, found at § 6237 of Blashfield's Cyclopedia of Automobile Law and Practice, Vol. 9C, p. 413, and American Jurisprudence 2d, Desk Book, p. 453, show that the truck could have been stopped in less than 10 feet, including reaction time. That he did stop on the main track apparently after sighting the train as his truck cleared the gondola cars supports this conclusion.

The engineer, Gould, testified that the front of the truck appeared from behind the gondola cars as he neared the easternmost car. There were four of these cars, each 54 feet in length, plus couplings. Thus the locomotive was probably about 250 to 350 feet from the crossing when the truck came from behind the cars. The train traversed this distance at the rate of about 88 feet per second, or in about 3 to 4 seconds.

The evidence establishes that the gondola cars and spools were in a position which completely blocked Oliver's view when he would have had the best chance of seeing the train and at a time when he still could have stopped his truck before reaching the main track. Therefore, the preponderance of the evidence supports the conclusion that, but for the presence of the loaded gondola cars, the accident would not have occurred.

The facts in Renz v. Texas & Pacific Railway Company, 138 So.2d 114 (La. App. 3d Cir. 1962), cert. denied, are very similar to those presented herein. In Renz, 138 So.2d at page 117, the court stated:

"It is further uncontradicted that on the day of the accident the defendant railroad had left two long gondola cars parked on the spur tracks at the crossing just 4½—6 feet west of the gravel road. Because of them, a northbound motorist approaching the crossing could not see trains approaching from the west until his front wheels were virtually on the tracks.

"However, the defendant contends that a northbound motorist could still observe eastbound trains approaching up until the motorist was about 35 feet south of the crossing, following which admittedly the gondolas prevent observation of oncoming trains.

"On the other hand, the plaintiff contends that the gondolas themselves blocked visibility of northbound motorists for a much further distance, pointing out for instance that the railroad engineer and firemen involved in the accident themselves admitted that the gondolas blocked out their own visibility of the oncoming car starting some 300–450 feet from the crossing until the car came up onto it. Plaintiff also relies upon unequivocal testimony that a motorist stopping at the railroad stop sign 52 feet south of the intersection could not, because of the parked gondola cars, see any train approaching from the west, further arguing that high weeds along the railroad right of way and an abandoned depot several hundred feet south of the crossing also interfered with a northbound motorist's observation of approaching eastbound trains.

\* \* \* \* \* \*

"To allow recovery either for the driver or for the passengers, the trial jury must have found that defendant-railroad was guilty of negligence. The preponderance of this evidence indicates that this negligence consisted of its parking the gondolas so close to the roadway as to create an extremely hazardous crossing whereby motorists were unable to observe approaching trains, and also in its giving inadequate warning of the approach of the train to such hazardous crossing. \* \* "

The court held that the Railroad was negligent, and that the motorist was not. A distinguishing factor is that Oliver could have seen the train before his view became blocked by the gondola cars whereas a majority of the court in the Renz case concluded that the motorist did

not have a clear view of the main track at any time.

The Louisiana Supreme Court much earlier announced in another crossing case, where the view of an on-coming train was obscured by the presence of freight cars and flat cars loaded with logs that "By leaving these cars so near the crossing and obstructing the view, defendant [the railroad company] increased the danger, and thereby assumed the duty of taking extra precautions for guarding against accidents." Cherry v. Louisiana & A. Ry. Co., 121 La. 471, 46 So. 596, 17 L.R.A.,N.S., 505 (1908).

The law generally applicable in crossing situations such as this was thoroughly discussed in McFarland v. Illinois Central Railroad Co., 122 So.2d 845 (La.App. 1st Cir., 1960); certiorari denied as to liability, but granted as to quantum. The court quoted approvingly 44 Am.Jur., Railroads § 507, which states:

"*Where View Is Obstructed.*—The principle that if a crossing is unusually dangerous, ordinary care requires the railroad company to meet the peril with unusual precautions, is particularly applicable where the dangerous condition results from obstructions to the view which prevent a traveler from seeing an approaching train until he is dangerously close to the track. In such a case, the railroad company has the duty of exercising caution commensurate with the situation to avoid collisions with travelers on the highway, as by a less amount of speed, or by increased warnings, or otherwise, or, if an unslackened speed is desirable, by keeping a watchman on duty, or some other sufficient means of warning travelers, such as gates or other safety devices. Thus, to pass over a busy crossing at a high rate of speed without giving signals, where the view of approaching trains is obstructed, has been held to be negligence per se. On the other hand, the giving of the signals required by statute at crossings does not exhaust the duty of the railroad company at such a crossing. This rule of care applies notwithstanding the obstructions to the view are legitimate and necessary in the conduct of the business of the railroad company. This rule is fair to the traveler and imposes no injustice upon the railroad company, because it is always within the power of the company to remove the source of danger which its own inattention has created. It has been held, however, that the mere obstruction of the view is insufficient to necessitate the slacking of speed where nothing obstructs the sound of the whistle.

"The question really is as to what is due care where the view of the tracks is obstructed, and it is usually left to the jury to say whether, in view of the obstructions, the company has exercised ordinary care in respect to the peculiarly dangerous condition of the crossing; whether ordinarily prudent men would have taken extra precautions; and whether such precautions were taken in the particular case. Obstructions of the view of approaching trains does not necessarily necessitate unusual precautions, such as stationing flagmen, where the danger is not great, as where the crossing is upon an unfrequented road."

A duty rested here upon the Railroad to take extra precautions for guarding against accidents at this crossing during the time that the loaded gondola cars obstructed the view of motorists attempting to traverse its tracks. No reason was given for placing the gondola cars so near the crossing, but it is apparent from the photographs that although the spur track extends a considerable distance to the east, the gravel loading area extends only about four car lengths from the crossing.

Placing the loaded gondola cars in the position indicated, at this crossing where a train approached on an up-grade and was not clearly visible until it was about 900 to 1000 feet away was negligent conduct. As stated earlier, the ac-

cident probably would not have occurred if these loaded gondola cars had not been placed so as to block Oliver's view during the last few critical seconds. Thus the Railroad Company's negligence in this respect was a direct, proximate cause of the accident.

In an excellent analysis of an automobile accident case, Justice Sanders remarked, "It is clear that more than one legally responsible cause can, and frequently does, contribute to a vehicular collision." Dixie Drive It Yourself System New Orleans Co., Inc., v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). Such a case is presented here. Oliver's negligence prevented his survivors from collecting damages for his death from the Railroad, and the Railroad's concurrent negligence similarly requires that its action for damages be dismissed.

The Railroad and Gould seek to hold the insurer of Kesk, Inc., United States Fidelity & Guaranty Company, responsible for the accident under the theory that it voluntarily assumed the duty of flagging traffic and negligently performed that duty. Barksdale Air Force Base required that Kesk, Inc. supply security guards at the gate during the hours the gate would be unlocked so construction workers could enter and exit. The guards normally stationed themselves just south of the railroad, between the tracks and the Base. Kesk, Inc. was also interested in having the guards flag traffic leaving the base upon the approach of a train, because the view to the east was obstructed by a hill. However, the instruction given the guards was that "all vehicular traffic will be stopped at a safe distance from the RR crossing when trains are approaching RR crossing intersections."

■■ The applicable rule of assumed duty is stated in the state court case arising out of the same accident that is involved in this case:

" 'It is the law that if one who is under no duty to another to protect him in person or property voluntarily assumes such a duty, he must perform it in a reasonably careful

manner, and while he is not bound to continue that duty permanently he must see that reasonable notice is given if he intends no longer to perform it.' Id., Taylor v. Roosevelt Irrigation District, 72 Ariz. 160, 232 P.2d 107, 110.

"The principle of law set forth finds precedent in A.L.I. Restatement of the Law of Torts, § 325. *It requires proof that the gratuitous services rendered were consistently relied upon.*" (Emphasis added.) Oliver v. Illinois Central Railroad Co., 135 So.2d 521, 529 (La.App.2d Cir. 1961).

The evidence fails to establish that the engineer, Gould, consistently relied upon the crossing flagman. The transcript of the state trial which was made a part of the record in this case indicates on pages 70–71 that when heading west Gould probably saw the guard only once or twice, but going east "usually always saw him." Under these facts there is no sound basis for holding Kesk, Inc., or its insurer responsible for the accident.

Accordingly, Civil Action No. 7782 will be dismissed at plaintiff's cost, and Civil Action No. 7900 will be dismissed as against United States Fidelity & Guaranty Company, insurer of Kesk, Inc.

■ In addition to his claim against the insurer of Kesk, Inc., Gould seeks recovery of damages from H. J. Symons Pool, Lloyds' Underwriters of London and British National Life Insurance Society, Ltd., the liability insurers of the Braswell Industries cement-mixer truck.

The preponderance of the evidence establishes that Gould was free from negligence. He sounded the proper whistle and bell signals, and he reasonably believed that Oliver saw and heard the train coming. Under the circumstances, there appeared to be no necessity for slowing the locomotive. When it became apparent that the truck would not stop, Gould did all that was possible to avoid the accident.

■ Both the Railroad and Oliver were negligent, and the negligence of

each proximately and concurrently contributed to the injury of Gould. However, his action was not filed against the Railroad. Since the accident and the filing of his suit occurred prior to the effective date of the 1960 amendment to Article 2103 of the LSA–Civil Code, which now allows contribution to be demanded between joint tortfeasors regardless of whether a joint judgment had been obtained against them, we denied a motion seeking to make the Railroad a third party defendant. See Brown v. New Amsterdam Casualty Co., 243 La. 271, 142 So.2d 796 (1962); Lanier v. T. L. James & Company, Inc., 148 So.2d 100 (La.App. 1st Cir. 1962).

As a result of the collision Gould sustained severe injuries, including numerous painful abrasions and lacerations, a compound fracture of the right ulna which required immediate surgery and insertion of an intramedullary nail, and two fractures in the region of the left pelvis. He was hospitalized for 26 days and was unable to return to work until about six months after the accident. Subsequently, a hernia was discovered which the weight of the evidence establishes was caused by the accident. This was corrected by an operation and after about 45 days he was again able to return to full time employment.

■■ Damages for his medical expenses of $1,844.50 are disallowed, since they were paid for by the Railroad, not by the Illinois Central Hospitalization Plan to which Gould had paid premiums for hospitalization and medical insurance coverage. Payments made by a joint tort-feasor to the injured party may be asserted by the other tort-feasor in mitigation of damages. Peats v. Martin, 133 So.2d 920 (La.App.2d Cir. 1961); 25 C.J.S. Damages § 98.

■ Four years after the accident Gould appears to have fully recovered, but, among other things, he has a large scar on his right arm and the evidence indicates that the arm may be as much as 20% disabled. His injuries were extremely painful, but his residual disabilities are slight. He lost wages amounting to $6,261.32.

Defendants in Civil Action 7900, as the liability insurers of Braswell Industries, Inc., are held to be indebted to Gould for pain and suffering, residual disability, and loss of past and future wages, in the amount of twenty-five thousand dollars ($25,000). This is the maximum liability of defendants under the applicable insurance policies for personal injuries to one individual.

A proper judgment should be presented in Civil Action No. 7782 by the defendants, and in Civil Action No. 7900 by the plaintiff. Proration of the total amount awarded should be in accordance with the respective policies of insurance.

Thus done and signed, in Chambers, in Shreveport, Louisiana, this the 13th day of March, 1964.