55 So.2d 693 (1951)
CALVERT FIRE INS. CO.
v.
TEXAS & P. RY. CO.
No. 3458.
Court of Appeal of Louisiana, First Circuit.
December 20, 1951.
*694 Peterman & Burden, Alexandria, for appellant.
E. Herman Guillory, Ville Platte, for appellee.
LOTTINGER, Judge.
This is a suit by Calvert Fire Insurance Company against The Texas & Pacific Railway Company for damages in the sum of $466.05, being the amount paid by petitioner to its insured, Delta Manuel, for damages caused his automobile when it was in a collision with a work train belonging to defendant. Petitioner paid the said damages and is petitioner herein by virtue of its right of subrogation arising under its insurance policy with Manuel. From judgment below in favor of petitioner, defendant appeals.
The accident occurred at approximately 9:00 o'clock on the morning of a clear day, August 12, 1949. Defendant, was, at the time, constructing a new railway track from Ville Platte to Opelousas. No regularly scheduled trains were yet operating on the track. The crossing at which the accident occurred had been completed about two weeks prior to the accident. The crossing intersects Louisiana Highway 119 just inside the corporate limits of Ville Platte. Said highway is a busy thoroughfare running from Ville Platte to Eunice. The highway and railway tracks intersect at approximately right angles, the highway running north and south, and the railway tracks running east and west.
Petitioner alleges that, on the morning of the accident, Howard Manuel was operating a new Plymouth automobile belonging to his father, Delta Manuel, in a northerly direction towards Ville Platte on said Louisiana Highway No. 119. The said automobile was new, it having been driven less than 1,000 miles, and young Manuel was driving at from 35 to 40 miles per hour. Young Manuel did not expect to meet a train at the crossing as he knew that the tracks were still under construction. Nonetheless, on approaching the crossing, and while at a distance of about 40 yards therefrom, he saw a train backing toward the crossing from his right. Manuel immediately applied his brakes and swerved to his left to avoid being hit by the train but was too late. At the moment of the impact, the automobile was either stopped, or was just about stopped, and had almost cleared the track. The lead car of the train struck the rear end of the automobile, and stopped just a few feet past the point of impact.
At the time of the collision, the train was proceeding westerly along the track. Shortly prior to the accident, the train was going at a speed of about 10 miles per hour. Upon approaching the crossing the conductor signalled the engineer to decrease the speed of the train. When about 300 or 400 yards from the crossing, the speed of the train was reduced to about 6 miles per hour. The conductor, who was stationed on the lead car, first noticed the Manuel car when it was some 400 to 600 feet from the crossing. At that time, the lead car was 30 or 40 feet from the highway. He testified that Manuel was going fast, about 60 miles per hour, however, he assumed that Manuel would stop for the crossing. The conductor did not become aware that the car was not going to stop until the train reached the crossing, at which time an emergency stop was ordered by the conductor, and the engineer immediately executed same.
The crossing was supplied with the usual "Stop, Look and Listen" warning. At the time of the accident, the train was proceeding in reverse, there being some twenty-two cars between the lead car and the locomotive. As the train proceeded westerly, the locomotive was the last car. The leading car was a "ballast" car, the sides of which extended some eight feet above ground level. The distance from the leading car to the locomotive was some 800 feet, or more.
*695 The allegations of petitioner were substantiated by the testimony of two witnesses who were following young Manuel at a distance of some two hundred yards. On the other hand, the allegations of the defendant were substantiated by several employees of the railway company, two of whom were riding on the lead car. As to the speed of plaintiff's insured, the lower court, in its discretion, chose to place more faith in the testimony of the witnesses for petitioner, and rendered judgment in its favor. Defendant took this, a suspensive, and devolutive, appeal.
We believe that the evidence and the testimony indicates that young Manuel was driving at a speed of about 40 miles per hour shortly prior to the accident. This is attested to by three witnesses for petitioner, one of which was young Manuel. This rate of speed is further indicated by young Manuel's statement that he did not see the train until he was about 40 yards from the crossing, at which time he immediately applied his brakes, and the testimony of one of defendant's employees who stated that he measured the skid marks of the Manuel car to be about 100 feet in length. Furthermore, there is no dispute that at the time of the impact the Manuel car had been brought to a complete stop, or almost a complete stop. According to Blashfield's Cyclopedia of Automobile Law, the total stopping distance of a car travelling 40 miles per hour would be 115 feet, of which the braking distance would be 71 feet. On the other hand, a car traveling 60 miles per hour would have a total stopping distance of 226 feet, of which the braking distance would be 160 feet. The figures apply when the brakes are in excellent condition, and we assume that such was the case here as the car was a new one. We, therefore, conclude that the Manuel car was proceeding at a speed of approximately 40 miles per hour just prior to the accident.
The train, just prior to the accident, was going from 6 to 8 miles per hour. This was shown by the testimony of all the defense witnesses. Furthermore, it was shown that the train had come almost to a stop some 30 or 40 feet before it reached the highway. The conductor, thinking that the Manuel car would come to a stop, flagged the engineer to proceed over the crossing. When it became apparent that the car would not stop, an "emergency stop" was executed, but was too late.
The contention, by petitioner, that the train was hidden by tall corn and weeds is hotly disputed by defendant, who introduced photographs showing the weeds to be no more than about two feet high. These pictures, however, were taken almost a month after the accident, and it might well be that the corn was harvested, or the weeds cut, during that period. Furthermore, it is well settled in our jurisdiction, that the more obstructed the view, the more care must be observed by the motorist. Illinois Central Ry. Co. v. Leichner, 5 Cir., 19 F.2d 118; Perrin v. New Orleans Terminal Ry. Co., 140 La. 818, 74 So. 160; Hutchinson v. Texas & N. O. R. Co., La.App., 33 So.2d 139; Stelly v. N. O. & Texas Ry. Co., La.App., 49 So.2d 640.
We believe that there was some negligence shown on the part of the defendant railway company. In view of the fact that this was a new crossing, the train was backing, and that the railway cars were of less than normal height, the employees of the company could, and should, have taken extra precautions. Although the whistle and bell had been sounded, it is possible that young Manuel heard neither, as the locomotive was some distance behind the lead car. We believe that, under the circumstances, the conductor should have gotten off the train and flagged the oncoming traffic. His failure to do so, however, would not lessen the negligence on the part of young Manuel.
We do not believe that there is any question that young Manuel was negligent. The usual railway crossing warning signs were situated at the crossing. His contention that he did not see them decidedly shows negligence, as it was his duty to see and obey the warning signs. He further testified that he did not see the train until it entered the crossing, at which time he was some 40 yards from the crossing. Upon being asked *696 whether he looked to ascertain whether a train was approaching, he replied: "I don't think I would have seen it with the tall weeds and low cars." This indicates that he did not look, but, on the contrary, attempted to negotiate the crossing in utter disregard of the warning signs.
The lower court based its decision upon the doctrine of last clear chance. The court below said:
"Assuming that Manuel was negligent in not stopping at the crossing, it appears from the testimony of the operators of defendant's train that they had seen the automobile coming towards the crossing several hundred feet away and that the train could have been stopped at that time, and if it had, the accident would have been avoided. If it is true, as testified by the operators of the train, that Manuel was driving at an excessive rate of speed when they saw his automobile 400 to 600 feet away from the crossing, they should have assumed that he was not aware of the approaching train or the crossing and would not stop.
"The court is not unmindful of the fact that passenger or freight trains with regular schedules, cannot be expected to stop at every crossing but, this was a slow work train with no fixed schedule entering a new crossing within the city limits of Ville Platte and its operators were grossly negligent in not stopping before entering the crossing, or having someone on the crossing to warn approaching vehicles."
We do not concur with the decision of the lower court. Although, as stated above, we do not feel that the employees of defendant were entirely free from negligence, we believe that they had a right to assume that the warning signs, and the laws of this state, would be observed. Rule 17, Section 3, of Act No. 286 of 1938, Louisiana LSA-RS 32:243, requires the driver of a motor vehicle to bring same to a complete stop in order to determine whether a train is approaching before entering a grade crossing. Thus, the defendant's employees cannot be held negligent for assuming that the law would be obeyed. While the automobile was from 400 to 600 feet from the crossing, they were still safe in assuming that it would stop, as the total stopping distance for a car traveling 60 miles per hour, as alleged by the employees, would be 226 feet. Upon their discovering that the car would not stop, they took every precaution to stop the train and avoid the accident.
The lower court cited O'Conner v. Chicago, R. I. & P. Ry. Co., La.App., 40 So.2d 663, in holding that the defendant had the last clear chance. In that case, the peril of decedent was discovered when the train was some 150 feet from the crossing, at which time the brakemen hollered to the engineer to stop the train. The evidence there showed, and the court concluded, that the engineer did not hear the warning, and the brakes were not applied until after the impact. There the defendant clearly had the last clear chance as, had the brakes been applied when the warning was given, the train could have stopped before hitting the car. The engineer should have been in a position to see or hear the warning.
A case, more similar to the present one, was that of Stelly v. Texas & N. O. Ry. Co., supra, decided by this court a few months ago. There the engineer again failed to hear the warning to stop. However, we there held that, even though the warning had been heard and the engineer had immediately applied the brakes, the train could not have been stopped in time to avoid the collision.
We, therefore, conclude that the defendant employees were correct in their assumption that young Manuel would stop at the crossing. Immediately upon it becoming apparent to defendant's employees that he would not stop, the "emergency stop" signal was given, and the engineer applied the brakes at once. The defendant did not have a last clear chance to avoid the accident.
For the reasons assigned, the judgment of the lower court is reversed, and petitioner's demand is dismissed. All costs are to be paid by petitioner.
Judgment reversed.