138 So.2d 114 (1962)
Ruby Spurgeon RENZ, Individually, etc., Plaintiff-Appellee,
v.
The TEXAS & PACIFIC RAILWAY COMPANY, Defendant-Appellant.
No. 443.
Court of Appeal of Louisiana, Third Circuit.
February 7, 1962.
Rehearing Denied March 14, 1962.
Certiorari Denied April 30, 1962.
*115 Frank H. Peterman, Alexandria, and Gerard F. Thomas, Jr., Natchitoches, for defendant-appellant.
Frugé & Foret, by Jack C. Frugé, Ville Platte, for plaintiffs-appellees.
Before TATE, SAVOY and HOOD, JJ.
TATE, Judge.
On the afternoon of January 16, 1960, a train operated by the defendant railroad struck an automobile driven by William Renz. As a result of this collision, Renz and his two passengers were killed, one of them being his five-year old daughter, Mary Ruth. This suit is brought by Renz' widow to recover individually for his death and also for the death of their minor child, Mary Ruth; and she also brings this suit in her capacity of natural tutrix of her surviving minor son, James William, to recover damages for his use and benefit arising from the death of his father. (By a companion suit the widow of James Spurgeon, the other passenger in the vehicle, also brought suit to recover damages arising out of the latter's death. See Spurgeon v. Texas & Pacific Railway Company, 138 So.2d 128, rendered this same date.)
The case was tried before a jury. The jury returned a verdict awarding the plaintiff, Mrs. Ruby Spurgeon Renz, $30,000 for the death of her husband, and an additional $50,000 for the death of her minor daughter. The defendant railroad appeals from judgment rendered pursuant to such verdict. The plaintiff answers the appeal, praying for an increase in the amount awarded the widow individually for the death of her husband and also that the judgment be amended so as to award damages for his father's death to the surviving minor child of the couple, James William Renz.
The plaintiff contends that the defendant railroad's gross negligence was the sole proximate cause of the tragic accident in which three lives were lost. Essentially, the plaintiff contends that the railroad negligently maintained an unusually hazardous and unsafe crossing, that its trains approached this unusally hazardous crossing at an excessive rate of speed, and that the railroad negligently failed to sound adequate warning of the approach of its passenger *116 trainthe railroad's negligence in each of these respects constituting a contributory proximate cause of the accident. Plaintiff's petition alleges that due to the high grass and weeds near the crossing, and due to the presence of the two gondola cars on the west side of the crossing, it was impossible for the decedent's approaching automobile to see a train approaching from the west. As to the operation of the train, the plaintiff alleges that it was travelling at an excessive rate of speed, that the operator did not keep a proper lookout, and that no proper warning was given by the approaching train.
The defendant railroad, on the other hand, contends, as stated in its brief, "that the accident was not caused by any fault or negligence on its part or that of its agents or employees; that the operators of the train had the right to believe that the occupants of the automobile would stop before driving on the track and that the train could have been seen by them before they entered the right-of-way; that said employees had no reason to believe that the automobile would be driven across the right-of-way and up onto the track in the path of the approaching train; that the failure of the driver of the automobile to observe the train as it approached, or in going on the track after he saw or should have seen it constituted negligence which was the proximate cause of the accident."
Alternatively, the defendant contends that contributory negligence in such respects defeats recovery on the part of the driver and of Spurgeon. The defendant-appellants finally contend that it was prejudiced by certain irregularities in connection with the jury trial, as a result of which, in the alternative, it is entitled to a remand for a new trial.

I.
The evidence shows that at about 3:00 P. M. on the cloudy Saturday afternoon of January 16, 1960, the decedent Renz was driving a Chevrolet north on a gravel road towards the Chopin community in Natchitoches Parish. Renz was driving the car, his daughter was sitting by his side, and Mr. Spurgeon was seated in the right front of the car. Their intention was to make a purchase at the general store located in the community of Chopin, Louisiana.
Before reaching the general store, the Renz automobile was required to cross a railroad crossing maintained by the defendant, The Texas & Pacific Railway Company. There are two tracks at this crossing, both running generally in an east-west direction. The southern track is a spur track, and the northern track is the main track. The crossing was somewhat steeply elevated from the level of the roadway, and the northern track was higher than the southern spur track.
As the Renz automobile approached the crossing from the south, there were two gondola cars standing on the left (or west) side of the crossing on the spur track, some four to six feet from the crossing.
When the Renz automobile was attempting to cross the railway track, a fast-moving passenger train approaching from the west at a speed of 70 mph struck the Renz automobile on its left side. The impact of the collision carried the automobile several hundred feet to the east of the crossing, and hurled all three of the passengers from the vehicle. The automobile was demolished, and all three occupants were killed instantly. The train was brought to a stop one-half mile away.
The gravel road upon which the Renz vehicle was approaching made a rather steeply inclined crossing over the railroad tracks. The main tracks were about four feet higher than the travelled level of the gravel road. In addition, for northbound traffic, the main tracks were one foot above the level of the spur tracks, making a steep rise during the ten-foot interval between the tracks. The roadway across the main track was over boards sixteen feet wide, but there were no boards to ease motor traffic's passage over the spur tracks.
*117 The uncontradicted testimony is that neither northbound nor southbound motor traffic could observe the other until at the crest of the crossing, and that, due to this circumstance as well as the relative narrowness and roughness of the crossing, the motorist was required in the operation of his vehicle across it to maintain the utmost concentration on the path ahead, in addition to the lookout required for oncoming trains.
It is further uncontradicted that on the day of the accident the defendant railroad had left two long gondola cars parked on the spur tracks at the crossing just 4½-6 feet west of the gravel road. Because of them, a northbound motorist approaching the crossing could not see trains approaching from the west until his front wheels were virtually on the tracks.
However, the defendant contends that a northbound motorist could still observe eastbound trains approaching up until the motorist was about 35 feet south of the crossing, following which admittedly the gondolas prevent observation of oncoming trains.
On the other hand, the plaintiff contends that the gondolas themselves blocked visibility of northbound motorists for a much further distance, pointing out for instance that the railroad engineer and firemen involved in the accident themselves admitted that the gondolas blocked out their own visibility of the oncoming car starting some 300-450 feet from the crossing until the car came up onto it. Plaintiff also relies upon unequivocal testimony that a motorist stopping at the railroad stop sign 52 feet south of the intersection could not, because of the parked gondola cars, see any train approaching from the west, further arguing that high weeds along the railroad right of way and an abandoned depot several hundred feet south of the crossing also interfered with a northbound motorist's observation of approaching eastbound trains.
As to the signals given by the approaching train, there is the usual conflict. The trainmen stated that horn signals were given continuously from a quarter of a mile before the crossing up until the crossing itself. Two witnesses who were in a car north of the crossing at the time of the accident stated, respectively, that the train just whistled once at a cattle-gap about eight hundred feet west of the crossing, or two to three times at this cattle-gap. Another non-railroad witness, a laborer working about 75 yards from the crossing on cotton gin grounds south of the tracks, stated that he only heard the train give three short blasts almost simultaneously with the collision with the automobile.
The plaintiff cites LSA-R.S. 45:561:
"Every railroad company or person owning and operating a railroad in this state shall equip each locomotive engine with a bell and a whistle or horn which, under normal conditions, can be heard at a distance of three hundred yards and, upon engines approaching at grade any street or highway crossing, whether or not said crossing shall be otherwise protected, shall, for a distance of not less than three hundred yards and until crossing is reached, cause either the bell to be sounded continuously or blasts of the whistle or horn to be sounded in the manner, provided by the Uniform Code of Railroad Operating Rules, * * *."

To allow recovery either for the driver or for the passengers, the trial jury must have found that defendant-railroad was guilty of negligence. The preponderance of this evidence indicates that this negligence consisted of its parking the gondolas so close to the roadway as to create an extremely hazardous crossing whereby motorists were unable to observe approaching trains, and also in its giving inadequate warning of the approach of the train to such hazardous crossing. The jury must have believed the testimony of the plaintiff's witnesses to the effect that the horn signals were not given continuously but only from one to three times, and at times when the train was *118 either so distant or so close to the tracks as to constitute a warning inadequate under the circumstances of this extremely hazardous crossing.
As we recently stated in Begnaud v. Texas & New Orleans Railroad Company, La.App. 3 Cir., 136 So.2d 123 (No. 386, decided December 21, 1961), "It has been repeatedly held that the court will not set aside the verdict of a jury in a case where the testimony is conflicting, when the testimony of the witnesses, if accepted as credible, is sufficient to sustain the verdict. * * * (Citations omitted)" In the cited case, we likewise affirmed an award against the railroad based upon accepting the testimony of witnesses observing the accident rather than upon a contrary version given by the defendant-appellant's trainman.
In other recent case, McFarland v. Illinois Central Railroad Company, La.App. 1 Cir., 122 So.2d 845 (certiorari denied as to liability, although granted restricted as to quantum), the court had before it a situation very similar to the present. The court stated, 122 So.2d 858: "We further find that because of the aforesaid obstructions a motorist driving southerly would have to proceed to a point of peril upon or dangerously near defendant's tracks before obtaining an unimpeded view of a westbound train an appreciable distance away."
In the McFarland case, our brothers of the First Circuit comprehensively analyzed and discussed the law applicable to situations such as the present. We think that the following excerpts from this opinion, in addition to the several other Louisiana cases cited therein, adequately dispose of the defendant-appellant's contentions herein. For, as the court there stated, 122 So.2d 853-854, 855-856:
"In support of defendant's contention learned counsel for defendant has cited numerous authorities relied upon as establishing freedom from fault on the part of defendant's employees under the circumstances shown herein. Additionally, esteemed counsel has cited innumerable decisions in which recovery of an individual has been barred because of contributory negligence resulting from failure to stop, look and listen prior to negotiating a railroad crossing. We have read many of the cited cases and have no quarrel with the results reached in view of the circumstances in each individual case. It is fundamental that the question of negligence of a particular defendant (as well as contributory negligence of a given plaintiff) is purely a question of fact to be determined in the light of the circumstances of each individual case.
"The `dangerous trap doctrine' principally relied upon by plaintiffs herein is clearly set forth in American Jurisprudence Volume 44, Verbo Railroads § 507, page 747, as follows:
"The principle that if a crossing is unusually dangerous, ordinary care requires the railroad company to meet the peril with unusual precautions, is particularly applicable where the dangerous condition results from obstructions to the view which prevent a traveler from seeing an approaching train until he is dangerously close to the track. In such a case, the railroad company has the duty of exercising caution commensurate with the situation to avoid collisions with travelers on the highway, as by a less amount of speed, or by increased warnings, or otherwise, or if an unslackened speed is desirable, by keeping a watchman on duty, or some other sufficient means of warning travelers, such as gates or other safety devices. Thus, to pass over a busy crossing at a high rate of speed without giving signals, where the view of approaching trains is obstructed, has been held to be negligence per se. On the other hand, the giving of the signals required by statute at crossings does not exhaust the duty of the railroad company at such a crossing. This rule of care applies notwithstanding the obstructions to the view are legitimate and necessary in the conduct of the business of the railroad *119 company. This rule is fair to the traveler and imposes no injustice upon the railroad company, because it is always within the power of the company to remove the source of danger which its own inattention has created. It has been held, however, that the mere obstruction of the view is insufficient to necessitate the slackening of speed where nothing obstructs the sound of the whistle.
"`The question really is as to what is due care where the view of the tracks is obstructed, and it is usually left to the jury to say whether, in view of the obstructions, the company has exercised ordinary care in respect to the peculiarly dangerous condition of the crossing; whether ordinarily prudent men would have taken extra precautions; and whether such precautions were taken in the particular case. Obstructions of the view of approaching trains does not necessarily necessitate unusual precautions, such as stationing flagmen, where the danger is not great, as where the crossing is upon an unfrequented road.' * * *
"* * * The crossing in question was obscured by the presence of freight cars parked in proximity thereto so as to impede the vision of a person crossing the tracks. In finding the defendant liable, the court in Cherry et ux. v. Louisiana & A. R. Co., 121 La. 471, 46 So. 596, 598, [17 L.R.A., N.S., 505,] stated as follows:
"`By leaving these cars so near the crossing and obstructing the view, defendant increased the danger, and thereby assumed the duty of taking extra precautions for guarding against accidents. Eichorn v. N. O. & C. R. L. & Pr. Co., 112 La. [236,] 237, 36 So. 335, 104 Am.St.Rep. 437.
"`Defendant not only took no extra precautions, but neglected even the ordinary ones. It ran this locomotive at extra speed and noiselessly on the other side of a train of cars, thereby laying a sort of trap, and gave imperfectly, if at all, even the ordinary signals of bell and whistle.
"`One who, on a public highway, approaches a railroad track, and can neither hear nor see any indication of a moving train, is not chargeable with negligence in assuming that there is none sufficiently near to make the crossing dangerous. * * *'
"`The famous case of Pokora v. Wabash Ry. Co., 292 U.S. 98, 54 S.Ct. 580, 582, 78 L.Ed. 1149, similarly held that there is no absolute duty upon a motorist "to get out of the vehicle and reconnoitre" before entering a railroad crossing as to which the view is completely obstructed, pointing out that such a sortie is "very likely to be futile, and sometimes even dangerous", 298 U.S. 104, 54 S.Ct. 582. The Court there held that at such a crossing, it was a factual question "whether reasonable caution forbade his (plaintiff's) going forward in reliance on the sense of hearing, unaided by that of sight," 298 U.S. 101, 54 S.Ct. 581.'"
In Simon v. Texas & New Orleans Railroad Company, La.App. 3 Cir., 124 So.2d 646, certiorari denied, this court affirmed an award in favor of a motorist driver who entered unto a railroad crossing when his view had been obstructed by high weeds negligently permitted by the railroad to grow in close proximity to the crossing.
We there stated, 124 So.2d 651-652:
"The Jury in arriving at its conclusion obviously determined that Simon, traveling the Old Segura Road in a northerly direction, had an obstructed view to his left which prevented him from seeing any train traveling in an easterly direction until he was very close to the railroad crossing. It must have also determined that the railroad company's train did not give a warning until it was very close to the crossing in order to find for plaintiffs after having been given the law by the Trial Judge. In arriving at the facts governing the case, the evaluation of the witnesses' testimony is of paramount importance. The Jury, in determining the facts of a case have the opportunity to see and hear the witnesses.
*120 The jurors also have the important task of evaluating the testimony as given by the witnesses. The Jury obviously believed the plaintiff's witnesses and the Trial Judge in his statement in his reasons overruling a motion for a new trial stated that he did not believe that the Jury had made any manifest error and that they were unanimous in their decision and conclusion. It has been repeatedly held that the Court will not set aside a verdict of the Jury in a case where the testimony is conflicting and where the testimony of the witnesses is sufficient to sustain such a verdict if accepted as credible. See Roux v. Attardo, La.App.1957, 93 So.2d 332; Cush v. Griffin, La.App.1957, 95 So.2d 860; Mire v. St. Paul Mercury Indemnity Company, La. App.1958, 103 So.2d 553; Hardie v. Allen, La.App.1951, 50 So.2d 74.
"The Jury's function is to find facts relating to negligence, contributory negligence, last clear chance, and damages. In the case of Ross v. Sibley, 116 La. 789, 41 So. 93, 95, the Supreme Court stated:
"`The question of negligence was one of fact, and we are not prepared to say that a verdict of the jury was erroneous.'
See also Henwood v. Wallace, 5 Cir., 159 F.2d 263; Foreman v. Texas & N. O. R. Company, D.C.La.1951, 97 F.Supp. 378; Missouri-Pacific Railroad Company v. Soileau, 5 Cir., 1959, 265 F.2d 90.
"That the Jury's findings on contributory negligence should be undisturbed unless they have no basis in evidence has been recognized in Aaron v. Martin, La.App.1936, 167 So. 106; Illinois Central Railway Company v. Aucoin, 5 Cir., 1952, 195 F.2d 983.
"Defendant contends that if in fact the view of Simon was obstructed then the greater caution the law enforces upon Simon and in support thereof cites Hutchinson v. Texas & N. O. R. Company, La.App. 1947, 33 So.2d 139; Calvert Fire Insurance Company v. Texas & Pacific Railway Company, La.App.1951, 55 So.2d 693; Brinson v. Illinois Central Railroad Company, 5 Cir., 241 F.2d 494. While it is true that if the right of way is obstructed the driver of the vehicle must exercise a higher degree of caution, the Courts have pointed out that the railroads are held to a degree of caution commensurate with the added hazard or danger which results from the existence of these obstructions. 44 American Jurisprudence, verbo, `Railroads', Section 508; Wyatt v. Yazoo & M. V. R. Co., 13 La.App. 632, 127 So. 479; Rachal v. Texas & P. Ry Co., 61 So.2d 525. Also see McFarland v. Illinois Central Railroad Company, La.App.1960, 122 So.2d 845. Assuming that the Jury found that the view was obstructed and considering the charges given by the Trial Judge to the Jury, then the Jury must have ascertained that the whistle blowing and bell ringing as testified by the engineer and fireman did not occur as they testified but that in fact they actually blew the whistle just a moment prior to the collision which occurred and, accordingly, did not exercise that duty commensurate with the situation at hand. * * *"
We find no error in the jury's determination that the negligence of the railroad company in the respects mentioned was the sole proximate cause of the present tragic accident.

II.
The defendant-appellant further urges, however, that the usual weight should not be attached to the jury's verdict herein because of certain procedural irregularities. Particularly, the defendant-appellant urges that the jury became confused because of the form of the instructions and that its verdict was not truly indicative of its actual findings. Alternatively, defendant-appellant requests a new trial because of these irregularities.
In furtherance of their forceful argument, able counsel for the defendants-appellants point out that the verdict forms furnished by the trial court to the jury through inadvertence did not include one for the jury to award (or to refuse to award) damage *121 to the plaintiff as tutrix of her surviving minor son for the death of his father; although such verdict forms had been furnished to the jury to return verdicts in favor or against the plaintiff for her individual claim for the death of her husband and also for her individual claim for the death of her minor daughter. Defendants-appellants further point out that the jury returned from its deliberations to request additional instructions, which were refused.
In its application for a new trial, the defendant-appellant furnished affidavits from several of the jurors that they did not intend to award any damages for the death of the decedent Renz but that their verdict was intended to award damages only for the death of Mary Ruth Renz, the five-year old daughter killed in the accident. The trial court sustained the objection of the plaintiff to any evidence by the jurors impeaching their own evidence, and it denied the defendant's motion for a new trial.
Before discussing these contentions in more detail, we think it is well to note that at the time neither party objected to the trial court's charge nor to its failure to include a verdict form for damages, if any, to be awarded to the plaintiff as tutrix of her surviving minor son; and the failure to object to the instructions waives any defects therein, LSA-C.C.P. Art. 1793.
Further, the minutes show: "And now into Court comes the Jury and through their foreman returns the following verdicts: `June 24, 1961. Verdict for plaintiff, Ruby Spurgeon Renz, for death of William A. Renz, for $30,000, with interest'. * * * `Verdict for Plaintiff, Ruby Spurgeon Renz, individually for death of Mary Ruth Renz for $50,000 with interest.' * * * Now the Court inquires of counsel if it is their desire that the Jury be polled, to which counsel answered that they do desire to poll the Jury. The Jury was polled and each and every Juror acknowledged this to be his verdict; whereupon the Court ordered that the verdicts be received and filed."
Finally, the same forceful arguments made to us were also made to the trial court in support of the defendant's motion for a new trial. The District Court, with the right and the duty to set aside the verdict if in the court's opinion it was contrary to the law and the evidence, nevertheless denied the defendant's motion for a new trial, thus indicating that it felt the jury verdict was not in manifest error and did not result from prejudicial procedural error.

III.
The minutes show: "Now the Jury is charged by the Court and the Jury retires in custody of the Sheriff to deliberate their verdict. Now into court comes the jury and requests that they be recharged on certain points. Request denied by the Court. Now the Jury retires again in the custody of the Sheriff to deliberate their verdict."
The minutes do not reflect that any objection was made by either counsel to the court's refusal to re-charge the jury or to furnish them additional instructions; so far as the record shows, the court's refusal to re-charge the jury was with the acquiescence of both counsel.
As stated at 89 C.J.S. Trial § 475b, pp. 118-119:
"According to the rule generally adopted, the court may, at the request of the jury, give them further instructions after they have retired to deliberate, since the interests of justice require that the jury have full understanding of the case, and the court may, without the consent of counsel, recall the jury and give additional instructions although but one juryman requests them. Furthermore, it has been said that the trial court has the same right to instruct the jury when it returns for further instructions after having retired as before the jury retires for the first time. * *
"It has been held that it is not error to refuse to give a further instruction requested by the jury, or to answer a *122 question by the jury or a juror, as where the giving of additional instructions would only serve to confuse the jury, where the question was not concerned with substantive law, where the jury requested an answer to a question which was in the province of the jury to answer, or where the requested additional instruction was on an issue not presented by the pleadings or evidence. It is not error for the court to refuse to comply with a general request further to read the law of the case which had already been read to the jury. While the request may properly be refused, where there is a statute providing that no further instructions shall be given after the argument begins, or where the request is for an instruction which could not be given, it is usually said to be the duty of the court to give such additional instructions when requested, and a prejudicial refusal to do so has been held reversible error. * * *"
On the other hand, the usual rule is that the right to attack upon appeal allegedly improper conduct by the trial court must be preserved by an objection made at the time, see 4A C.J.S. Appeal and Error § 794. For, as stated in Bertoli v. Flabiano, La.App. 1 Cir., 116 So.2d 76, 79, where the court refused to consider a contention made upon appeal that opposing counsel's argument was prejudicially improper, on the ground that the appellant had made no objection thereto prior to the adverse verdict, the appellate court stated that "* * * in the absence of objection to allegedly improper argument, the trial court is afforded no opportunity to prevent or correct the alleged error, and the plaintiff must be deemed to have waived his right to complain of the alleged impropriety upon appeal."
We note that under LSA-C.C.P. Art. 1793, "A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection." Likewise, it seems to us, a party may not assign as error the failure of the trial court upon request therefor to give additional instructions after the cause is submitted to the jury, unless at the time he specifically objects to such failure, in order to afford the trial court an opportunity to prevent error and an unnecessary re-trial of the matter. Counsel may not permit or acquiesce in an easily corrected procedural error and then, after an adverse verdict, urge such error for the first time as a ground for setting aside the jury's verdict reached by the expensive and cumbersome method of jury trial.

IV.
As shown by the minutes, the jury rendered a verdict "for plaintiff, Ruby Spurgeon Renz, for the death of William A. Renz, for $30,000." Following rendition of this verdict, "The Jury was polled and each and every Juror acknowledged this to be his verdict".
Nevertheless, the defendant by affidavits from some of the jurors and a tender of proof sought to produce evidence from the jurors that by this verdict they did not intend to award anything for the death of William A. Renz, because they felt he was contributorily negligent; but they intended instead to award the plaintiff, Ruby Spurgeon Renz, as tutrix of her minor son James William Renz, the sum of $30,000 as damages to him for the death of his minor sister, Mary Ruth Renz,
This would amount to the substitution of an entirely different verdict from that reached by the jury after their deliberations and entered into the minutes of the court as their formal verdict after polling each member of the jury; a substituted verdict which, moreover, was not authorized by the trial court's instructions and which *123 is contrary to law, since a brother may not recover for his sister's wrongful death when there is a surviving parent, LSA-C.C. Art. 2315.
The trial court correctly held inadmissible the affidavits or testimony of jurors to impeach their own verdict or to show on what grounds it was rendered. Long ago, under similar circumstances, our Supreme Court held: "The testimony was objected to and ruled out, on the ground that a juror cannot be heard as a witness to impeach the verdict of a jury of which he was a member. The ruling was manifestly correct, under repeated decisions of this court. State v. Bird, 38 La.Ann. [497] 499; State v. Chretien, 35 La.Ann. [1031] 1032; State v. Price, 37 La.Ann. [215] 218; State v. Millican, 15 La.Ann. 557; State v. Brette, 6 La.Ann. 653; State v. Caldwell, 3 La.Ann. 435." State v. Morris, 41 La.Ann. 785, 786, 6 So. 639.
See also: Godfrey v. Soniat, 33 La.Ann. 915; Duhon v. Landry, 15 La.Ann. 591; Jeter v. Heard, 12 La.Ann. 3; Cire v. Rightor, 11 La. 140; Campbell v. Miller, 1 Mart. (N.S.) 514; Klein v. Medical Building Realty Co., La.App. Orleans, 147 So. 122.
No Louisiana cases contrary thereto are cited by defendant-appellant, and none could be found. It therefore appears that, under the settled jurisprudence, the trial judge was correct in refusing to admit evidence showing that the jurors wished to impeach their verdict.
The holding of the Louisiana courts seems to be in accord with the jurisprudence of other states. In 53 Am.Jur. "Trial" Section 1105 (1945), the general rule, along with the reasons for the rule, are stated:
"While matters of impeachment extrinsic to the verdict may, according to the view of many courts, be shown by the testimony of jurors, it is a long-established and generally accepted doctrine, except where modified by statute, that testimony or affidavits of jurors impeaching a verdict rendered by them will not be received where the facts sought to be shown are such as inhere in the verdict.
"The rule is founded on public policy, and is for the purpose of preventing litigants or the public from invading the privacy of the jury room, either during the deliberations of the jury or afterwards. It is to prevent over-zealous litigants and a curious public from prying into deliberations which are intended to be, and should be, private, frank, and free discussions of the questions under consideration. Further, if after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would open the door for tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under sanction of oath.
"Testimony of the jurors to impeach their own verdict is not excluded because it is irrelevant to the matter in issue, but because experience has shown that it is more likely to prevent them to promote the discovery of the truth. Hence, the affidavit of a juror cannot be admitted to show anything relating to what passed in the jury room during the investigation of the cause, or the effect of a colloquy between the court and a juror, or the arguments made to a juror by a fellow juryman. The rule that a verdict cannot be impeached by the testimony of a juror is generally adhered to where it is sought to impeach a verdict on grounds of misconduct on the part of the juror or his fellow jurors, despite apprehension expressed in many cases that such rule sometimes serves the cause of injustice. In some jurisdictions the rule has been changed by statute allowing affidavits of jurors for the purpose of impeachment of a verdict on the ground of *124 misconduct of the jury. It seems, moreover, to be a recognized limitation in many jurisdictions that if the foundation can be laid by testimony aliunde that the jurors were guilty of such misconduct as to warrant setting aside the verdict, evidence of the jurors in corroboration and in amplification thereof may be heard" pp. 769-771.
This general rule is also stated in substantially the same manner in 89 C.J.S. Trial § 523 (1955).
Conceding the correctness of this general rule, the defendant-appellant nevertheless argues that affidavits and testimony of jurors are admissible to correct clerical errors and to show when through mistake the wording of the verdict filed does not reflect the actual intent of the jurors in reaching their verdict, or when the foreman incorrectly reported that a verdict was reached when in fact it was not. See 53 Am. Jur. "Trial", Sections 1110, 1115; 89 C.J.S. Trial § 523. If such exception to the general rule is applicable in Louisiana, we think that nevertheless in the present instance the affidavits and testimony of the jurors, if accepted, would not amount to a correction of an improperly recorded verdict but to the substitution of an entirely different one; as previously stated, under the uniform Louisiana jurisprudence the testimony of the jurors is inadmissible to impeach in such manner their formal verdict.
To reiterate, before concluding: The trial court has virtually unlimited discretion to order a new trial, even on its own motion, when it is convinced that a miscarriage of justice has resulted. See LSA-C.C.P. Arts. 1971, 1973. A new trial must be granted if the trial court is convinced "that the jury was bribed or has behaved improperly so that impartial justice has not been done," LSA-C.C.P. Art. 1814. In denying the defendant's motion for a new trial, our trial brother must have thoroughly considered the contentions of the defendant that the procedural errors relied upon had resulted in an erroneous verdict, as well as the contentions that the verdict was contrary to the law and the facts. We attach great weight to its finding, by denying the new trial, that such contentions of the defendant were not well founded.

V.
Having found no manifest error in the trial court's holding that the accident resulted solely from the negligence of the defendant railroad company, the remaining questions concern a review of the amount of the awards.
The jury awarded the plaintiff thirty thousand dollars for the death of her husband, William A. Renz and also awarded her fifty thousand dollars for the death of her five year old daughter, Mary Ruth.
The defendant questions the latter award as excessive. By answer to the appeal, the plaintiff requests that the award to the widow for the death of her husband be increased, and she further prays that additionally judgment should be rendered in the amount of $20,000 to her as tutrix of her son, James William Renz, and for his benefit, since the jury failed to award any damages at all to this boy.
Neither of the jury awards are itemized so as to show how much is for loss of support, how much loss of love, affection and companionship and how much for special damages for funeral expenses and the destruction of the automobile. However, by their total, the jury valued the loss caused by both the death of both the decedent husband and that of the small daughter as having a monetary value of no more than eighty thousand dollars, insofar as such irreparable losses can ever be valued in money.
At the time of his death the decedent Renz was 48 years of age, with a life expectancy of 22 years, as calculated from the mortality table at LSA-R.S. 47:2405. He had been married to the plaintiff for eighteen *125 years. At the time of her husband's death, the plaintiff was 40 years of age with a life expectancy of 28 years. Of this marriage two children were born, James William, age fifteen at the time of the accident, and Mary Ruth, age five at the time she was killed in the same accident as her father, the decedent herein.
The evidence shows this to have been a close-knit and harmonious family. The husband's hobbies were hunting and fishing, in which he indulged mostly with his boy. According to the wife, the decedent spent most evenings at home, having stayed away from home overnight only once on a fishing trip with the son.
The decedent was a carpenter by trade. His income tax returns between the years 1953 and 1959 (except for 1956) were entered into evidence and showed that his annual income ranged between $3554.40 and $5,189.32, averaging over $4200 annually.
The proven special damages were funeral expenses for the husband in the amount of $2000.00 and of $1146.50 for the child, both paid by the plaintiff, together with the complete destruction of the family automobile, a 1956 Chevrolet automobile valued at $960.00. These special damages total $4106.50.
Following the husband's death, his widow became very nervous, and it was necessary for her to secure the attentions of a psychiatrist, and for her mother to stay with her for about ten months after the accident. Coupled with the shock of simultaneously losing her husband and her child were the circumstances of the accident, in which the bodies were mangled so badly that they could not be exposed at the funeral home before the burial.
In Swillie v. General Motors Corporation, La.App. 3 Cir., 133 So.2d 813, certiorari denied, we recently had occasion to review the recent jurisprudence of the Supreme Court regarding the award of damages made by trial juries. We there pointed out that the Supreme Court had apparently rejected the use of precise mathematical formula for the assessment of damages for loss of support but that, 133 So.2d 825:
"A review of all of these recent expressions of our Supreme Court indicates clearly that in the fixing of damages much discretion must be left to the trial judge or jury and their decision as to the issue of quantum will not be disturbed unless there is an abuse of discertion. With this as our fundamental guiding principle we will attempt to test the award in this case to determine whether it is excessive or inadequate."
In the Swillie case, the decedent was a 29-year old truck driver, with annual earnings of $3600.00 and with a life expectancy of 36 years. The jury had awarded the widow $30,000 and each of the two minor children $25,000, for a total of $80,000. We found this total award to be reasonable under the circumstances, but we allocated the amounts comprehended within the total verdict by deducting the special damages and amounts reasonably awardable for loss of love and companionship, etc., and then, after determining that the residual amount for loss of support was not manifestly excessive, by dividing same among the widow and children. In this Swillie case, we awarded the widow $10,000 for loss of love, affection, and companionship, and the additional amount of $22,794.20 for loss of support, together with the special damages. We further awarded support, together with the special damages. We further awarded each of the children $6000 for loss of love, affection and companionship, and $10,000 and $12,000 respectively for loss of support.
In another recent case, Simon v. Texas & New Orleans Railroad Company, La.App. 3 Cir., 124 So.2d 646, certiorari denied, we affirmed an award of $45,000 to a widow of a 38-year old decedent with a life expectancy of 29 years and an average annual income of $4,700. We indicated that $35,000 of this amount was for loss of support and *126 that approximately $10,000 was for loss of love and companionship. We likewise awarded a 14-year old son of the decedent $13,000 for loss of love, affection and companionship and $3500 for loss of support; and a 16-year old son $10,400 for loss of love, affection and companionship and $2,600 for loss of support. In the Simon case we likewise followed the principle of not disturbing the gross award of the trial jury, although reallocating the amounts for loss of support, love and companionship, etc., within the verdict among the individual beneficiaries.
With regard to the present instance we think it is manifest that the loss of the plaintiff wife of love, companionship and affection, and her mental suffering and anguish arising from the death of both her husband and her daughter was compounded in both cases by the complete destruction of the family unit. Likewise, in the case of the surviving son, the damages due to him for the mental anguish and the loss of the affection, love, companionship and guidance from the loss of his father was compounded by the circumstances of this loss, whereby, in the blinking of an eye, a happy, united, loving family of four was destroyed, leaving only two lonely survivors, a nerve-wrecked mother, and a sixteen year old boy losing the guiding hand and love and companionship of his father at a time of life when these intangibles are of utmost importance.
Considering all these circumstances, we think that the jury could reasonably have concluded that the widow was entitled to an award of twelve thousand five hundred for the loss of the love and companionship of her husband under such circumstances, and an equal amount for the loss of her little girl (whom the evidence shows to have been her constant companion). She is also entitled to an award in the amount of ten thousand dollars as tutrix of and for the benefit of James William Renz for the loss of love, companionship, affection and guidance arising from the death of his father under the circumstances shown.
The proven special damages of $4,106.50 will be awarded to the widow.
This leaves the amount of $40,893.50 for the loss of support sustained by both the widow and the son, which we do not find to be excessive. Of this amount, we will award $8000 for loss of support of the minor son, James William Renz. The balance of $32,893.50 will be awarded to the widow for her own loss of support. These awards do not appear to be manifestly excessive in the light of the jurisprudence. See Swillie and Simon cases, above-cited. See also: Marler v. State, La.App. 2 Cir., 78 So.2d 26, certiorari denied; Stephens v. Natchitoches Parish School Board, La. App. 3 Cir., 137 So.2d 116 (Docket No. 429; decided January 29, 1962).
To recapitulate, it is our opinion that the total award of $80,000 made by the jury for the wrongful deaths of William Renz and his minor daughter, Mary Ruth, was not an abuse of discretion; but that the amounts awarded will be redistributed as shown by the decree herein.
For the reasons hereinabove set forth, the judgment appealed from is amended so as to award the plaintiff, Mrs. Ruby Spurgeon Renz, individually, the sum of Forty-nine Thousand Five Hundred Dollars for the death of her husband, William A. Renz, and an additional amount of Twelve Thousand Five Hundred Dollars for the death of her minor child, Mary Ruth Renz; the plaintiff is further awarded, as tutrix of and for the use and benefit of her minor son, James William Renz, an additional amount of Eighteen Thousand Dollars for the death of his father; together with legal interest on these amounts from the date of judicial demand until paid. The judgment is otherwise affirmed in all respects. All costs of this appeal are assessed against the defendant-appellant.
Amended and affirmed.

*127 On Application for Rehearing.
En Banc. Rehearing denied.
FRUGÉ, J., recused.
HOOD, J., dissents.
HOOD, J., concurs in part, dissents in part, and assigns written reasons.
Before TATE, SAVOY and HOOD Judges.
HOOD, Judge (concurring in part, dissenting in part).
I concur with the majority in their conclusion that plaintiff is entitled to recover damages for the death of her minor child, Mary Ruth Renz, and that the plaintiff in the companion suit entitled Ida Johnson Spurgeon v. Texas & Pacific Railway Company, 138 So.2d 128, decided by us on this date, also is entitled to recover. I am compelled to disagree with them, however, in their finding that in this case Mrs. Renz is entitled to recover, individually and as natural tutrix of her minor son, for the death of her husband.
The evidence convinces me that as Mr. Renz approached this railroad crossing from the south he had an open, clear and unobstructed view of the oncoming eastbound train when he was 551 feet from the crossing and that he continued to have an open and unobstructed view of the train from that point until he reached a point within 30 or 35 feet of such crossing. While he was traveling in his automobile that distance of more than 500 feet, he had a clear view of the track to the west, from the place where the accident occurred to a point at least one-quarter of a mile west of the accident crossing. His view became obstructed by the two stationary gondolas only after he reached a point within 30 or 35 feet of the crossing. Because of the location of those gondolas he was not able to see the train as he traveled these remaining few feet to the crossing where the accident occurred. It is reasonable to conclude that Mr. Renz did not see the train approaching, because it will not be presumed that he deliberately placed himself and his passengers in a position of imminent peril.
In my opinion the deceased driver was negligent in failing to see the approaching train before he reached the point where his view became obstructed, which point was within 30 or 35 feet of the place where the accident occurred. His negligence in that respect, I think, was a proximate and contributing cause of the accident, barring plaintiff, individually and as natural tutrix of her minor son, from recovering for her husband's death. See Calvert Fire Insurance Company v. Texas & Pacific Railway Company, La.App. 1 Cir., 55 So.2d 693; Young v. Louisiana Western Railway Company, 153 La. 129, 95 So. 511; Callery v. Morgan's Louisiana & T. R. & S. S. Company, 139 La. 763, 72 So. 222; Gray v. Illinois Central Railroad Company, La.App. 1 Cir., 132 So.2d 61; Stelly v. Texas & N. O. Railway Company, La.App. 1 Cir., 49 So.2d 640; Oliver v. Illinois Central Railroad Company, La.App. 2 Cir., 135 So.2d 521.
The facts in Oliver v. Illinois Central Railway Company, supra, are almost identical to the facts presented here. In the Oliver case four gondola cars were spotted adjacent to and immediately east of the accident crossing, on a spur track which ran north of and parallel to the main track. The evidence showed that the decedent, a south-bound motorist approaching this crossing, could see the train approaching from the east until he reached a point about 37 feet from the spur track. The gondolas obstructed his view from that point until he reached the place where the accident occurred. Since the motorist could have seen the train approaching before he reached a point within 37 feet of the track, however, the Court held that he was negligent in failing to see it and in attempting to cross the track in front of the oncoming train. The negligence of the deceased motorist in failing to observe the approaching train before his view was obstructed by the *128 gondolas was held to be a proximate and contributing cause of the accident. It seems to me that the rule applied in the Oliver case should be applied here.
For the reasons herein set out, I concur with the decree of the majority in this case insofar as it amends and affirms the judgment in favor of Mrs. Renz for the death of her minor daughter. I respectfully dissent from that portion of the majority opinion, however, which decrees that Mrs. Renz, individually and in her capacity as natural tutrix of her son, is entitled to recover for her husband's tragic death.