346 So.2d 1373 (1977)
Leonard R. BOURQUE, Plaintiff and Appellant,
v.
OLIN CORPORATION et al., Defendants and Appellees.
No. 5916.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1977.
Rehearing Denied June 24, 1977.
*1374 Francis E. Mire, Lake Charles, for plaintiff-appellant.
Scofield, Bergstedt & Gerard by Thomas M. Bergstedt, Arnette & George, W. Gregory Arnette, Jr., Jennings, Brame, Bergstedt & Brame by John E. Bergstedt, Lake Charles, for defendants-appellees.
Before HOOD, CULPEPPER and STOKER, JJ.
*1375 CULPEPPER, Judge.
This is a suit for damages for personal injuries. Plaintiff, a truck driver for Matlack, Inc., was burned by a liquid chemical when a hose came loose from a coupling of his truck during loading operations. The truck was being loaded at the plant of defendant, Olin Corporation. Also named as defendants are three employees of Olin Corporation and two employees of Matlack.
The case was tried before a 12-man jury which found Olin and two of its employees negligent, plaintiff contributorily negligent, and the remainder of the defendants free of negligence. Plaintiff filed a motion for a new trial which was denied. Plaintiff then appealed that portion of the judgment declaring him to be contributorily negligent.
The issues are: (1) Is there a reasonable evidentiary basis for the jury's conclusion that plaintiff was contributorily negligent? (2) Did the trial court err in instructing the jury that contributory negligence was a defense? (3) Did the trial court err in not instructing the jury to apply the doctrine of comparative negligence? (4) Did the trial court err in instructing the jury on two occasions to continue deliberating to try to reach a verdict, even though the jury was apparently having difficulty in reaching a decision?

GENERAL FACTS
Plaintiff was employed as a truck driver by Matlack, Inc., and worked out of Matlack's Lake Charles terminal. On Sunday night, August 10, 1975, plaintiff was ordered by the Matlack terminal manager to report to the Olin plant in Lake Charles on the following morning, August 11, with a truck (tractor) equipped with a pump and hoses to be used in the loading of a Matlack tank-type trailer at the plant. After the trailer was loaded, plaintiff was to attach it to his tractor and haul it to Ohio.
Ordinarily, this chemical was loaded into tank trucks by the gravity flow method from an elevated holding tank. On this occasion, however, there was not a sufficient quantity of chemical in the holding tank to fill the tank trailer by the gravity flow method. For this reason, plaintiff was instructed to drive a tractor equipped with a pump on Monday morning.
When plaintiff arrived at the Olin plant on Monday morning with his truck and hoses, he found the Matlack tank-type trailer partially loaded with a chemical substance known as "Ortho-TDA" (TDA). TDA is not caustic, but must be heated to a temperature of about 180 degrees to assume the liquid state necessary for loading and transport. Plaintiff attached the end of one of the truck hoses to the TDA "feedline" and the other end of the hose to the intake on his pump. He attached a second truck hose between the intake valve on the tank-type trailer and the discharge outlet on his pump. Matlack owned and maintained these hoses. Each end of the hoses was equipped with a coupling device.
Three Olin employees, Booth, Sirman and Comeaux, conducted the loading operation for Olin. Booth had considerable experience in loading TDA and other chemicals. He was designated as the "operator". Sirman and Comeaux were "trainees" who had been working for Olin only a short time. These three men met plaintiff at the Olin plant shortly after he arrived to begin the TDA loading operation.
Plaintiff started the pump by operating a switch located in the cab of the truck. The truck's engine provided power for the pump. Booth, who was on top of the tank trailer, saw that no TDA was flowing into the trailer and informed plaintiff that the pump was not working. Plaintiff got out of the truck cab and looked under it to discover what was wrong. He noticed the drive shaft for the pump was missing.
Plaintiff then went to the nearby control room and telephoned the shop foreman at the Matlack terminal in Lake Charles. Mr. Peoples, the shop foreman, told Bourque to measure the shaft and call back. Bourque measured the shaft and called back, but did not wait for the part to arrive. Instead, he and Booth returned almost immediately to the truck to resume the loading operation.
*1376 When Booth and plaintiff returned to the truck after making the telephone call, there was a sufficient amount of TDA in the holding tank to fill the trailer by the gravity flow method without the necessity of using the pump on the truck. TDA from the partially loaded trailer and from the TDA feedline had filled the two hoses previously attached by Bourque. In conformance with the standard practice in the Olin plant, Booth decided to purge TDA from the hoses into the trailer with nitrogen pressure, rather than allowing the chemical to run onto the ground or into the atmosphere. Booth and Sirman testified that Booth asked plaintiff if the chemical would "flow through" his pump without the pump operating. Both testified that plaintiff answered "Yes". Plaintiff did not recall Booth's question, but could not deny that Booth asked it.
Many different types of trucks with various types of pumps are loaded at the Olin plant. Olin loading crew employees necessarily rely on the knowledge of the truck drivers regarding the operation of the equipment on their trucks, including pumping equipment. Plaintiff was quite familiar with the general operation of the pump, as he had used it on many previous occasions. Plaintiff did not test the operation of the pump before he arrived at the Olin plant.
After hearing from Bourque that the chemical could be purged through his pump, the Olin loading crew attached a nitrogen line to the TDA feedline. A gate-type nitrogen block valve had to be opened before the pressurized nitrogen would enter the hoses and push the TDA from the hoses into the trailer. Comeaux and Sirman opened the nitrogen block valve only slightly. Within a few seconds of the opening of the valve, the hose between the pump and the TDA feedline slipped or popped off the coupling at the point where it was attached to the TDA feedline. Hot TDA escaped from the hose, inflicting first, second and third degree burns on plaintiff's legs. Plaintiff's legs eventually healed with no residual disability.
The cause of the hose coming loose from the coupling is uncertain. It may have been excessive pressure. It may have been improper attachment of the coupling device to the end of the hose. It may have been a combination of these or other factors. The hose was repaired and returned to service. It could not be located at the time of trial. Its manufacturer was unknown.
The following facts regarding causation were developed at trial. First, the hose assembly which failed had a rated capacity of 50 pounds per square inch (psi) but had been tested at anywhere from 75 psi to four times its rated capacity. Second, Olin's nitrogen pressure available at the TDA loading site ranged from 80 to 120 psi. Third, if there was a blockage or obstruction anywhere between the nitrogen source and the open vessel (tank trailer) into which the TDA was being purged, the hoses would have been pressurized to the full plant pressure almost immediately after the nitrogen valve was opened. Fourth, contrary to what Bourque told Booth, liquid substances cannot ordinarily be purged through an inoperative rotary-type positive displacement pump as the one installed on Bourque's truck. Significant quantities of liquid could be purged through the pump only if its interior working parts were severely worn. There is no evidence that the pump was severely worn. Thus, the pump probably blocked or impeded the free flow of the TDA through the hoses and into the tank trailer after the nitrogen pressure was applied.
Previously, the contents of chemical hoses had often been purged into open vessels with nitrogen pressure without the hoses separating from their couplings. Unlike certain other nitrogen drop lines at the plant, however, the drop line in the TDA loading area was equipped with neither a pressure regulator nor a pressure gauge.

PLAINTIFF'S CONTRIBUTORY NEGLIGENCE
The case was submitted to the jury on eight interrogatories, none of which indicate *1377 the specific acts constituting plaintiff's contributory negligence. There is, however, a reasonable evidentiary basis for a conclusion that plaintiff was negligent in telling Booth that TDA could be purged through the truck pump when it probably could not be. Similarly, there is a reasonable evidentiary basis for concluding the blockage at the pump caused the pressure in the hose to build to the point that it caused the hose to separate from the coupling. The hose failure could have been caused by other factors, but the jury could reasonably have concluded the blockage at the pump was the cause.
Since there is a reasonable evidentiary basis for the jury's verdict with regard to plaintiff's contributory negligence, the verdict should not be disturbed on appeal. We pretermit the issue of the negligence of the several defendants.
The remainder of plaintiff's arguments are directed at alleged errors made by the trial court in charging or instructing the jury. The negligence charge, itself, is not contested.

ALLEGED ERRORS IN JURY CHARGE AND INSTRUCTIONS
At the outset, we note that plaintiff made no objection to the charges before the jury retired to consider its verdict. LSA-C.C.P. Article 1793 provides:
"A party may not assign as error the giving or the failure to give any instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection."
Failure to timely object to the jury charge waives the right to urge on appeal errors in the charge as grounds for reversal and remand. Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3rd Cir. 1975) (writ denied, La., 321 So.2d 363); Renz v. Texas & Pacific Railway Company, 138 So.2d 114 (La.App. 3rd Cir. 1962), writ denied. Likewise, the right to attack on appeal an allegedly improper instruction given after the case has been submitted to the jury must be preserved by an objection made at the time the supplemental instruction is given. See Renz v. Texas & Pacific Railway Company, supra. The policy considerations underlying these rules are obvious. As Judge Tate stated in Renz, "Counsel may not permit or acquiesce in an easily corrected procedural error and then, after an adverse verdict, urge such error for the first time as a ground for setting aside the jury verdict reached by the expensive and cumbersome method of a jury trial."
However, we need not rest our decision to reject plaintiff's jury charge arguments on his failure to timely object to the charges. For the reasons which follow, we find no merit in any of the arguments.
First plaintiff argues the trial judge erred in charging the jury that contributory negligence could bar plaintiff's recovery. Specifically, plaintiff argues that this is a case where defendant was engaged in an ultra-hazardous activity to which plaintiff's contributory negligence is not a viable defense, citing Langlois v. Allied Chemical Company, 258 La. 1067, 249 So.2d 133 (1971). The simple answer to this argument is that the present case does not involve an ultra-hazardous activity, but is instead an ordinary negligence action. Contributory negligence, of course, is a viable defense in a negligence action.
Along the same lines, plaintiff argues that contributory negligence is not a defense in a products liability case. Khoder v. AMF, Inc., 539 F.2d 1078 (5th Cir. 1976); Hastings v. Dis-Tran Products, Inc., 389 F.Supp. 1352 (W.D.La.1975). Without addressing the issue of whether contributory negligence is a defense in such an action, we note the present case is not a products liability case. The manufacturer of the subject hose and coupling assembly is not a party. The owner of the hose and coupling is Matlack, plaintiff's employer, against whom plaintiff's sole remedy is for workmen's compensation.
Second, plaintiff argues the trial court erred in not instructing the jury to apply the doctrine of "comparative negligence". *1378 This doctrine has consistently been rejected by Louisiana courts and is inapplicable.
Third, plaintiff alleges the trial court erred in instructing the jury on two separate occasions to try to reach a verdict, even though it was obviously having difficulty doing so. Plaintiff argues these instructions amounted to the "Allen charge", which the Louisiana Supreme Court has prohibited in criminal jury trials. See State v. Nicholson, 315 So.2d 639 (1975). Briefly, the "Allen charge" is an instruction calculated to break jury deadlocks and achieve jury unanimity. It is characterized by a coercive suggestion to the minority members that they change their votes to those held by the majority. Plaintiff has cited no case applying the "Allen charge" rule in civil cases.
The jury reached its verdict after deliberating a total of five hours. The contested instructions were given on two separate occasions, once when the jury returned with a legal question and once when the judge called the jury into the courtroom when it became obvious they were having difficulty in reaching a verdict. At no time did the jury declare it was deadlocked.
We have reviewed the contested instructions and find them neither prejudicial nor coercive. The judge merely recognized the difficulty which the jury was having in deciding the case and, in effect, asked them to keep trying. He asked the jury to "give it another effort, just go back and sit down and talk it out among yourselves." He noted that even hard cases could be decided. He clarified his instructions on one occasion stating, "I don't want you to misinterpret what I'm saying as any kind of pressure, because it is not pressure." He closed his special instructions with these impartial words of encouragement:
"It's a time when a lot of patience is required, when a lot of understanding is required, and please don't get mad at each other; nobody else is mad at you so why should you get mad at each other. Just be as patient with each other as you possibly can. Remember that this is a very serious matter. We are going to abide by your decision, whatever it is. If you cannot decide it, the next time you come back I will accept that, but we would all be very grateful to you if you can reach a decision. Please try once more."
In our opinion, the contested comments of the judge were permissible because they did not prejudice plaintiff's case. The judge's gentle coaxing toward a verdict was qualified by his repeated statement that he was not pressuring the jury and would accept their failure to reach a verdict.
Plaintiff obtained affidavits from five of the jurors after trial. These affidavits were introduced into evidence in connection with plaintiff's motion for a new trial. Two of the nine jurors who voted that plaintiff was contributorily negligent stated they did so because they were tired of "fussing and bickering". There were no allegations of wrongdoing in the affidavits, however.
The testimony of jurors to impeach their own verdict is inadmissible in Louisiana. Dieudonne v. Guidry, 336 So.2d 990 (La. App. 3rd Cir. 1976), writ refused; Renz v. Texas & Pacific Railway, supra. Thus, the affidavits are not grounds for setting the verdict aside.
For the reasons assigned, the judgment appealed is affirmed. The costs of this appeal are assessed against plaintiff-appellant.
AFFIRMED.